**In re William Reid THOMPSON, Debtor.**

**William Reid THOMPSON, Plaintiff,**

**v.**

**BOARD OF TRUSTEES OF THE FAIRFAX COUNTY POLICE OFFICERS RETIREMENT SYSTEM, Defendant.**

Bankruptcy No. 93–15316–AB.
Adv. No. 94–1045.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

May 23, 1995.

Robert L. Vaughn, Jr., Glennon, Goodman & Lubeley, Reston, VA, for Thompson.

W. McCauley Arnold, Cowles, Rinaldi & Arnold, Ltd., Fairfax, VA, for the Board.

**MEMORANDUM OPINION**

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

At issue is whether the defendant, the Board of Trustees of the Fairfax County Police Officers Retirement System (the "Board"), may withhold retirement benefits payable to the debtor, William Reid Thompson, notwithstanding the automatic stay and the discharge injunction. Since 1987, the Board has been withholding benefits from Thompson in order to recover overpayments it made to him during the 1970s and 1980s. Thompson filed his Chapter 7 petition in 1993, and notified the Board of his bankruptcy shortly thereafter. Thompson alleges that the automatic stay prohibits the Board from withholding his retirement benefits. The Board responds that it is allowed to withhold the benefits under the doctrine of recoupment, which operates as an "equitable exception" to the automatic stay. For the reasons that follow, we find that, even if recoupment is an exception to the automatic stay, it does not apply in this instance. The Board, however, does have a right of setoff, as recognized by 11 U.S.C. § 553. Therefore all or part of its claim is secured and has not been discharged. Finally, as explained more fully below, the circumstances of this case dictate that we lift the automatic stay retroactively, as of the petition date, which effectively ratifies the Board's efforts to collect the overpayments.

I.

Thompson joined the police department of Fairfax County, Virginia, in 1969. As a full-time police officer, he became a participant of the disability and retirement plan currently administered by the Board. In 1971, Thompson was injured in a work-related automobile accident. As a result of his injuries, he was granted a disability retirement, and the Board began paying him benefits in 1973.

To address the issues presented here, it is important to provide some background regarding the disability and retirement plan administered by the Board. Currently, the plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), and

the plan's provisions include a non-alienation clause, which shields the plan's assets from the reach of outside creditors. *See* Va.Code § 51–127.30, *incorporated in* Va.Code § 51.1–805(2) (Michie 1994). The plan's assets derive from employee contributions, contributions made by Fairfax County, and the income generated by investments.

From these assets, the Board pays two types of benefits: disability benefits and retirement benefits. Each benefit is subject to separate limitations and requirements. Under the provisions governing disability benefits, injured police officers may receive payments totaling 66.67% of the salary they would have received had no injury occurred. The Board pays these benefits for the duration of the disability, or until the officer becomes eligible to receive ordinary retirement benefits. During the first five years of receiving disability benefits, a police officer may be required to submit to one medical examination per year, so the Board may determine whether the officer is still disabled and thus entitled to benefits. After this initial five-year period has elapsed, the Board may require a disability recipient to undergo a medical examination every three years. Failure to submit to a medical examination may result in the loss of benefits. In the case at hand, the Board required Thompson to undergo these medical examinations after it started paying him disability benefits in 1973.

In addition to requiring medical examinations, the Board may decrease the amount of disability benefits it pays in proportion to the amount of outside income an injured officer earns. For instance, the Board may reduce benefits to the extent an officer makes over 100% of the average police salary he or she would have received had no injury occurred. To monitor the amount of outside income earned, the Board requires all officers receiving disability benefits to submit their tax returns and W–2 forms each year for the Board's review. If the Board determines, based on this review, that it overpaid disability benefits by a certain amount, it may use all or part of the subsequent payments to offset that amount. Except for the period between 1979 and 1983, the foregoing restrictions and requirements were in effect while Thompson was receiving disability benefits.

As for retirement benefits, retired officers may receive payments totaling 60% of the average salary they were earning before retirement. To qualify for retirement benefits, a police officer must complete 25 years of service. This includes "creditable" service, which means that injured officers, such as Thompson, may qualify for ordinary retirement benefits, even though they retired previously on disability. It is important to emphasize, however, that disability benefits and retirement benefits are separate interests. A police officer may qualify for retirement benefits without ever having received payments for a disability. So too, the plan contemplates that a disabled officer may die or become "separated from service" before he or she completes the requisite 25 years, thus become ineligible to receive ordinary retirement benefits. *See id.* § 51–127.21, *incorporated in* Va.Code § 51.1–805(2) (Michie 1994). After reaching the 25–year mark, retired officers may receive ordinary retirement benefits on a monthly basis during the balance of their lives. Most importantly, however, retirement benefits are not subject to the same controls restricting disability payments. In other words, retired police officers need not undergo medical examinations, nor do they have to report any outside income earned.

What prompted this dispute was the outside income Thompson earned while he was on disability. In 1987, Thompson pleaded guilty in federal court to the charges of (1) conspiracy to distribute and sell illegal drugs, (2) making a false statement on a tax return, and (3) making a false statement on an application to purchase a firearm. The Board subsequently determined that, as a result of his illegal activities, Thompson earned over $6 million from 1974 to 1986, and it also found that he either omitted or understated his income in reports he furnished to the Board. Based on its calculations, the Board determined that the overpayments it made during the years 1974–78 and 1984–86 totaled $89,011.47. The Board asked Thompson to repay this amount, but he apparently declined to do so. Pursuant to Va.Code § 51–

127.26, *incorporated in* Va.Code § 51.1–805(2) (Michie 1994), and other provisions, the Board decided to suspend its monthly payments to Thompson until 1999 in an effort to collect the overpayments it made. It thus sought to offset the overpayments against future benefits. Thompson appealed the Board's decision to the Fairfax County circuit court, but the court dismissed the appeal on grounds that it was untimely filed.

On December 29, 1993, Thompson petitioned for relief under Chapter 7 of the Bankruptcy Code, thus invoking the automatic stay. *See* 11 U.S.C. § 362(a). His attorney promptly notified the Board of the petition's filing, and asserted that the automatic stay prohibited the Board from withholding benefits in order to collect the overpayments it made. Additionally, on January 1, 1994, Thompson obtained his 25 years of creditable service, and thus became eligible to receive ordinary retirement benefits. One month later, on February 1, 1994, the Board informed Thompson that it would continue withholding retirement benefits, notwithstanding the automatic stay. Thompson then commenced an adversary proceeding against the Board, seeking declaratory and injunctive relief and money damages as a result of the Board's alleged violation of the stay. The Board subsequently filed an answer and counterclaim against Thompson.

The relief sought by Thompson is an injunction directing the Board to pay him his monthly retirement benefit of $1,540.89. He also seeks attorney's fees and damages that would compensate him for moving his family to Hawaii, which is an event that occurred postpetition. The Board asserts that it is allowed to withhold the benefits, as they become due, under the doctrine of recoupment, which operates as an "equitable exception" to the automatic stay. Alternatively, the Board asks that the Court lift the stay, and thus enable it to continue withholding the retirement benefits. We took this matter under advisement following a full-day hearing on the merits. Shortly after the hearing, Thompson was granted a discharge which, in turn, terminated the stay. *Id.* § 362(c)(2)(C). Accordingly, the Board must now contend with the discharge injunction, in addition to the automatic stay.

## II.

"The automatic stay is one of the fundamental debtor protections supplied by the Bankruptcy Code." *University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065, 1074 (3d Cir.1992). "It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." H.R.Rep. No. 595, 95th Cong., 2nd Sess. 340 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 54–55, (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5840–41, 6296–97. As additional protection, 11 U.S.C. § 362(h) provides that "[a]n individual injured by any willful violation of [the] stay ... shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages."

■ The Board asserts that no damages are warranted because no "violation" of the stay has occurred. It contends that it is withholding the retirement benefits under the doctrine of recoupment, which operates as an "equitable exception" to the automatic stay. Generally, "[r]ecoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim." *First Nat'l Bank v. Master Auto Svc. Corp.*, 693 F.2d 308, 310 n. 1 (4th Cir.1982). In the era of common-law pleading, recoupment functioned as an equitable rule of joinder, enabling parties to litigate in one proceeding claims that would have otherwise been pursued separately. *Lee v. Schweiker*, 739 F.2d 870, 875 & n. 5 (3d Cir.1984); 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1401, at 11 (2d ed. 1990). Since then, in modern practice, both the counterclaim and the affirmative defense have subsumed the doctrine of recoupment. *See* 2A James W. Moore, *Moore's Federal Practice* ¶ 8.27[3], at 8–177 to 178 (2d ed.

1995). Yet recoupment is still significant in bankruptcy, for some courts have recognized it as a nonstatutory exception to the automatic stay. *E.g., University Med. Ctr.*, 973 F.2d at 1079; *Long Term Disability Plan of Hoffman–LaRoche, Inc. v. Hiler (In re Hiler)*, 99 B.R. 238, 242 (Bankr.D.N.J.1989).

■ Related to recoupment is the doctrine of setoff. "A set-off is a counterclaim arising from an independent claim the defendant has against the plaintiff." *Master Auto Svc.*, 693 F.2d at 310 n. 1. "The right of setoff may arise contractually or under state law, and it allows a creditor to apply one mutual debt against another to avoid 'the absurdity of making A pay B when B owes A.'" *Citizens Bank v. Strumpf (In re Strumpf)*, 37 F.3d 155, 157 (4th Cir.1994) (citation omitted) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913)), *cert. granted,* —— U.S. ——, 115 S.Ct. 1398, 131 L.Ed.2d 286 (1995). Unlike recoupment, a creditor's right of setoff is subject to the automatic stay. 11 U.S.C. § 362(a)(7). Furthermore, a creditor's right of setoff is not recognized in bankruptcy unless both opposing claims arose before the petition date. *Id.* § 553(a). Recoupment, on the other hand, is not so limited for it may be invoked where the creditor's claim arose prepetition and the debtor's claim postpetition. *See Lee*, 739 F.2d at 875. The Board relies on both doctrines in asserting its defense and counterclaim. Accordingly, we apply each doctrine to the facts *seriatim.*

### A.

■ Recoupment requires the "setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *Westinghouse Elec. Corp. v. Fidelity & Deposit Co.*, 63 B.R. 18, 21 (E.D.Pa.1986) (quoting 4 *Collier on Bankruptcy* ¶ 553.03 (15th ed.)). It constitutes "only a challenge to the validity and extent of the plaintiff's claim, and no affirmative recovery is permitted." *Brown v. General Motors Corp.*, 152 B.R. 935, 938 (W.D.Wis.1993). In essence, recoupment serves as a defense, not a claim, against the plaintiff's cause of action. *Id.; see also*

*Brock v. Career Consultants, Inc. (In re Career Consultants, Inc.)*, 84 B.R. 419 (Bankr.E.D.Va.1988) (finding that debtor's breach of contract permitted the government to withhold, or recoup, the money it owed the debtor under the contract). To determine whether recoupment applies in this instance, we must resolve two issues. First we must determine whether the plan administered by the Board is a contract, or whether it is instead a government-entitlement program. If it is the latter, one line of authority holds that recoupment cannot apply. The second issue concerns whether the countervailing demands asserted here arise from the same transaction.

■ As to the first issue, Thompson contends that recoupment cannot apply because the disability and retirement plan is a government-entitlement program. In support of his position, Thompson relies on *Lee v. Schweiker*, 739 F.2d 870 (3d Cir.1984), which addressed the issue of whether the government could recoup Social Security overpayments from the debtor. The court of appeals in *Lee* observed that recoupment applied in bankruptcy when both the debtor's claim and the creditor's claim arose "out of the same contract." *Id.* at 875. The court then found that the Social Security payments at issue did not arise from a contract, but were instead statutory entitlements. *Id.* at 876. Therefore recoupment could not be invoked. Citing *Lee*, Thompson asserts that the retirement plan here is a creation of statute. Both the Virginia Code and applicable county ordinances control how the plan is administered and what rights are available to plan participants. The plan is therefore a statutory entitlement program analogous to Social Security.

The plan in question here differs from Social Security and other entitlement programs. The benefits paid by the plan are not available to the general populace simply on the basis of demonstrated need. Rather, only the employees of the Fairfax County police department can participate in the plan and receive benefits. Thus the plan is part of the overall compensation and retirement package made available to police-department employees. In this respect, the plan is no

different from any other pension or retirement system created by a private employer. Granted, the plan's provisions are set forth in the state and county statute books. But this does not eliminate the plan's "contractual" quality. Other contracts serving as a basis for recoupment have incorporated statutes into their own provisions, and the courts have allowed recoupment in those instances. *See, e.g., Career Consultants,* 84 B.R. at 425. Thompson probably did not bargain for certain provisions contained in the plan. Yet this again does not eliminate the plan's "contractual" nature any more than it would eliminate the contractual aspect of boilerplate agreements that govern most consumer transactions. For these reasons, we find Thompson's argument unpersuasive.

We turn then to the issue of whether the countervailing demands made by Thompson and the Board arise from the same transaction. Some courts have found that countervailing claims arise from an identical transaction when a single contract governs the parties' conduct. For example, in *Waldschmidt v. CBS, Inc.,* 14 B.R. 309 (M.D.Tenn.1981), CBS and a musician entered into a recording contract in which CBS agreed to pay the musician royalties generated from the sale of his albums. CBS made advance royalty payments to the musician, who subsequently filed for bankruptcy. The advances paid by CBS ultimately exceeded the royalties collected. Relying on the doctrine of recoupment, CBS sought to recover the overpayments from the musician's bankruptcy estate. The court in *Waldschmidt* agreed that recoupment was available to CBS, for the advances and royalties involved grew out of the recording contract and thus "unquestionably [arose] from the same transaction." *Id.* at 314.

■ One contract alone, however, is not sufficient to establish a single transaction, since separate transactions may occur within the confines of the contract. This was the situation presented in *University Medical Center v. Sullivan (In re University Medical Center),* 973 F.2d 1065 (3d Cir.1992). There, the government and a hospital entered into a so-called "provider agreement" in which the hospital agreed to treat Medicare patients

and the government agreed, in exchange, to pay the cost of providing such treatment. The government then made advance payments to the hospital to cover the Medicare services the hospital would provide. Based on an annual audit, the government would modify subsequent payments to account for any over or underpayments it previously made. After the hospital filed for bankruptcy in 1988, the government withheld all postpetition payments in order to recoup the overpayments it made in 1985. The court of appeals held that recoupment could not be invoked, finding that the transactions at issue were distinct. As the court explained, "[r]ecovery of the 1985 overpayment [was] the final act of the transactions that began in 1985. [The hospital's] 1988 post-petition services were the beginning of transactions that would stretch into the future, but they were not part of the 1985 transactions." *Id.* at 1082. Furthermore, the court distinguished *Waldschmidt,* which is discussed above, on grounds that the royalty advances made in that case pertained to a specified record album. *Id.* at 1081.

Similarly, in *Hagan v. Heckler (In re Hagan),* 41 B.R. 122 (Bankr.D.R.I.1984), the government overpaid the debtor certain government benefits. Relying on recoupment, the government sought to deduct these overpayments against future postpetition benefits. The court rejected the government's recoupment argument, reasoning that the overpayments and the debtor's claim for future benefits arose from separate transactions. Specifically, the court found that the debtor's eligibility for receiving benefits was based on need, which the government determined on a month-to-month basis. Hence the court concluded that the overpayments could not be construed as "advances" because, at the time she received the overpayments, she had not yet proven her eligibility for future benefits, particularly the benefits that were payable postpetition. Accordingly, the court in *Hagan* determined that it could not view the payment of past and future benefits as a single ongoing transaction. *Id.* at 126.

■ The instant case is more analogous to the situations presented in *University Medi-*

*cal Center* and in *Hagan.* As in *Hagan,* Thompson's right to disability benefits depended on his need at a given point in time. At specified intervals, the Board determined whether Thompson qualified for further disability benefits based on medical examinations and the income statements he submitted. Each interval represented a separate transaction. Had Thompson not submitted to a medical examination, the Board would have had the right to cancel further disability payments. The Board has offered no proof that Thompson could have received a lump-sum payment, discounted at present value, representing the amount of disability benefits he would receive over his lifetime. In other words, the disability benefits are not designed to "provide a means of assuring future financial security, but only to provide income when [they are] actually needed." *Cf. Hagan,* 41 B.R. at 126. Consequently, we cannot conclude that the overpayments Thompson received represent "advances" on future benefits.

Even more compelling are the differences between the disability payments Thompson received prepetition and the retirement benefits he claims postpetition. Unlike disability benefits, one's eligibility for receiving retirement benefits does not hinge on medical examinations or the income statements submitted to the Board. To qualify for retirement benefits, a police officer must only complete 25 years of creditable service, and the record reflects that Thompson did so after he filed his bankruptcy petition. Thus his eligibility for retirement benefits represents a transaction distinct from his eligibility for disability benefits. It is important to emphasize again that an officer may qualify for retirement benefits without ever receiving disability. So too, the plan's provisions contemplate that an officer receiving disability payments may not necessarily qualify for retirement benefits. Hence the disability and retirement benefits represent separate interests and therefore constitute separate transactions. The Board's recovery of overpayments is the "final act" of transactions that started prepetition. Thompson's claim for retirement benefits, which is based on his 25 years of creditable service, is part of another transaction that will extend into the future. *Cf. University Medical Center,* 973 F.2d at 1082. Consequently, we hold that the countervailing claims asserted here do not arise from the same transaction.

The Board also deploys several other factual and legal arguments. First, it asserts that the retirement benefits claimed by Thompson are simply a continuation of the disability benefits he has received. Specifically, the Board points to the testimony of its retirement administrator, who indicated that the benefits claimed by Thompson are treated as disability, not retirement payments. *See* Trial Transcript at 115. We are unpersuaded. The Board concedes that Thompson is no longer obligated to submit to medical examinations or to report his income in order to qualify for benefits. In short, the Board is no longer making determinations as to whether Thompson is disabled. Furthermore, the Board's own documents recognize the dichotomy involving disability benefits and retirement benefits. *See* Ex. 5K. Were Thompson to receive his benefits today, he would be paid only 60% of his average pre-retirement salary—the proportion attributed to retirement benefits—rather than the 66.67% figure that is associated with disability benefits. All of these circumstances lead to the conclusion that Thompson is claiming retirement benefits, not disability benefits.

The Board also relies on the testimony of an expert witness, an attorney specializing in tax matters. At the hearing, the expert testified that, according to various rulings issued by the IRS, the benefits claimed by Thompson are treated as disability, and are therefore not subject to federal income taxes. Because the benefits claimed by Thompson are not subject to taxes, the Board contends that the benefits are really in the nature of disability, not retirement. Again, we are unpersuaded by the Board's logic. In this instance, we are asked to decide whether separate transactions exist for purposes of recoupment, not for purposes of federal income taxation. Inasmuch as recoupment operates as a nonstatutory exception to the automatic stay, we believe the "same transaction" requirement should be construed very narrowly. *See University Med. Ctr.,* 973 F.2d at 1081. The expansive

gloss supplied by these IRS rulings is not consistent with the narrow interpretation applied by the courts. Consequently, we do not believe the tax treatment of these benefits is relevant.

■ Next the Board argues that its right to collect the overpayments is not a "claim" subject to the automatic stay and the discharge injunction. The Bankruptcy Code defines the term "claim" quite broadly; section 101 of the Code provides that the term "claim" means a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment," regardless of whether such right "is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(5). The Board nevertheless relies on the Code's legislative history, which purports to exclude an insurance-policy loan from this expansive definition of "claim". See H.R.Rep. No. 595, 95th Cong., 2nd Sess. 310 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 23 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5809, 6267.[1]

Some courts have determined that other types of loans are similar to the insurance-policy loan mentioned in the legislative history, and accordingly these loans do not represent "claims" that may be discharged. For instance, the court of appeals in New York City Employees' Retirement System v. Villarie (In re Villarie), 648 F.2d 810 (2d Cir. 1981) (per curiam), held that an advance made to the debtor from his future retirement benefits was not a "claim" as defined by the Bankruptcy Code. The advance made in Villarie was drawn from the debtor's own contributions to the retirement fund, and thus involved his own money, which he had the right to receive either as an "advance" or as a benefit paid in the future. Also important to the court in Villarie was the fact that the retirement fund did not have the power

to sue the debtor to collect the advance. Instead, the only "enforcement mechanism" available to the fund was its power to deduct a portion of the debtor's paycheck to cover the advance it made. Because the fund had no power to commence a collection action against the debtor, the court of appeals determined that the fund's right to payment was not enforceable, and therefore was not a "claim" dischargeable in bankruptcy. Id. at 812.

Also, in In re Scott, 142 B.R. 126 (Bankr. E.D.Va.1992), a Chapter 13 debtor borrowed against his interest in an employee pension plan. After the debtor filed for bankruptcy, he submitted a repayment plan proposing to use a portion of his disposable income to pay back the amount withdrawn from his pension. The debtor asserted that the amount borrowed from his pension constituted a secured claim which required him, in turn, to repay the amount in full. The court in Scott disagreed, reasoning that the debtor's pension loan did not represent a "claim" as defined by the Bankruptcy Code. In reaching this decision, the court addressed the legislative history cited above, and it followed the reasoning outlined in Villarie. Particularly relevant to the court was the fact that the only means available for collecting the loan was a wage assignment on the debtor's income, which the debtor could terminate at will. Id. at 131. The court also emphasized that the debtor could borrow only a portion of the amount contained in his pension plan account, which meant that the debtor had merely withdrawn funds that were otherwise payable to him in the future. Id. at 131–32. Relying on Villarie, Scott and similar decisions, the Board suggests that the case at hand is analogous to a loan drawn from an insurance policy or pension plan, and accordingly it lacks a "claim" that is subject to discharge.

1. Specifically, this portion of legislative history provides as follows:

This definition of "debt" and the definition of "claim" on which it is based ... does not include a transaction such as a policy loan on an insurance policy. Under that kind of transaction, the debtor is not liable to the insurance company for repayment; the amount owed is merely available to the company for setoff against any benefits that become payable under the policy. As such, the loan is not a claim (it is not a right to payment) that the company can assert against the estate; nor is the debtor's obligation a debt (a liability on a claim) that will be discharged....

Id.

The situation at hand is different from the circumstances presented in *Villarie, Scott,* and the other cases cited by the Board. None of the cases cited by the Board involved the type of disability and retirement benefits currently before us, which in this instance constitute separate interests and therefore separate transactions. These cases did not address a situation in which the creditor makes disability overpayments before bankruptcy, and then seeks to recoup the overpayments through the withholding of retirement benefits after bankruptcy intervenes. As explained above, Thompson had not yet qualified for ordinary retirement benefits when he received the disability overpayments. Hence the overpayments cannot be regarded as a "loan" or an "advance" of the retirement funds he would otherwise receive in the future. We therefore find the cases cited by the Board inapposite.

 Also unavailing is the assertion by the Board that it has no enforceable right to collect the overpayments and therefore has no "claim." The Board suggests that it cannot sue Thompson directly to recover the overpayments. Rather, the only collection procedure at its disposal is the withholding of future retirement benefits. We do not believe that a circumscribed method of enforcement, in and of itself, can remove a right to payment from the Bankruptcy Code's expansive definition of "claim." Otherwise, prior to bankruptcy, creditors could bargain for a restricted method of collection in order to exempt their claims from the automatic stay and discharge injunction. The Bankruptcy Code does not support such an absurd result. Under the plain language of the Code, the term "claim" includes any "right to payment" regardless of the enforcement mechanism available to the creditor. *See* 11 U.S.C. § 101(5). Furthermore, without the availability of the recoupment doctrine, the Board's method of withholding future benefits may be deemed (at best) a setoff, which is a collection procedure blocked by the automatic stay. *Id.* § 362(a)(7). We will address whether the Board has a recognized right of setoff subsequently. For the moment, however, we find that the Board's right to collect the overpayments is a "claim" under the Bankruptcy Code.

 The Board also asserts that its retirement plan is comparable to an executory contract that a trustee must either assume or reject under 11 U.S.C. § 365. Section 365 is "designed to 'allow[ ] the trustee or debtor in possession a reasonable time within which to determine whether adoption or rejection of the executory contract would be beneficial to [the estate].'" *University Med. Ctr.,* 973 F.2d at 1075 (quoting *Data–Link Sys., Inc. v. Whitcomb & Keller Mortgage Co. (In re Whitcomb & Keller Mortgage Co.),* 715 F.2d 375, 379 (7th Cir.1983)). Drawing a comparison between an executory contract and the retirement plan, the Board asserts that Thompson cannot receive the benefits of the retirement plan without assuming its burdens—particularly the burden of reimbursing the Board for the overpayments it made. *Cf. Hiler,* 99 B.R. at 243–44. The problem with the Board's position here is that § 365 does not apply to the situation at hand. The plan at issue here is governed by ERISA. The plan also includes an anti-alienation clause, which shields its assets from the reach of outside creditors. Such a clause is enforceable inside bankruptcy. *See* 11 U.S.C. § 541(c)(2); *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Consequently, Thompson's interest in the plan is not deemed to be part of the bankruptcy estate, *see In re Hanes,* 162 B.R. 733, 738 (Bankr.E.D.Va.1994), so there is nothing for the trustee to assume or reject.

 In addition to its argument concerning executory contracts, the Board indicates that the retirement plan should be treated as a quasi-contract. Specifically, it suggests that Thompson will receive unjust enrichment if he is permitted to recover his retirement benefits without first reimbursing the Board for the overpayments. To prevent unjust enrichment, the Board asserts that it should be allowed to pursue recoupment. Although the Board's position highlights the equities of the situation, it fails to inform us as to how the Board's claim arises from the very transaction giving rise to Thompson's claim. As indicated above, equity alone cannot invoke recoupment; instead, the countervailing demands at issue must arise from the

same transaction. Again, we emphasize that the "same transaction" requirement should be construed narrowly. *See University Med. Ctr.*, 973 F.2d at 1081. Having employed a narrow interpretation in the discussion above, we conclude that the "same transaction" requirement has not been met.

■ This does not mean, however, that debtors have a "license to commit fraud" against their creditors. *See Baker v. United States*, 100 B.R. 80, 84 (M.D.Fla.1989). If the Board has ample grounds for believing that it overpaid Thompson as a result of his alleged fraud, it may pursue a nondischargeability action under 11 U.S.C. § 523(a)(2). (Indeed, we note that the Board has already commenced a § 523 proceeding). But we will not allow the Board to obtain a preferred position in bankruptcy, in violation of the Code's express provisions, simply on the basis of equity. *Cf. Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir.1987) (concluding that equity cannot serve as the basis for establishing an emergency medical treatment fund for unsecured creditors prior to confirmation of a Chapter 11 plan), *cert. denied*, 485 U.S. 962, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988). For these reasons, we conclude that the Board cannot effect a recoupment.

### B.

■ Alternatively, the Board contends that it has a right of setoff as allowed by 11 U.S.C. § 553. Unlike recoupment, a setoff may be accomplished even if the countervailing claims arise from separate transactions. *Hiler*, 99 B.R. at 241. By and large, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case. . . ." 11 U.S.C. § 553(a). In other words, bankruptcy law recognizes only those setoffs involving mutual claims that arose before the commencement of the bankruptcy case. *See Waldschmidt v. Columbia Gulf Transmission Co. (In re Fulghum Constr. Corp.)*, 23 B.R. 147, 151 (Bankr. M.D.Tenn.1982).

■ "To be mutual, the debts must be in the same right and between the same parties, standing in the same capacity." *Bank of Cairo & Moberly v. Thurston (In re Thurston)*, 139 B.R. 14, 15 (Bankr.W.D.Mo.1992) (quoting 4 *Collier on Bankruptcy* ¶ 553.04[2], at 553–22 (15th ed.)). The mutuality requirement is established here, for Thompson and the Board are standing in the same capacity and are asserting the rights that existed before the filing of the bankruptcy petition. As noted above, Thompson's interest in the retirement benefits is not property of the estate by virtue of 11 U.S.C. § 541(c)(2). The Board is not compelled to assert its rights against the Chapter 7 trustee. Accordingly, this is a dispute involving Thompson and the Board, and the mutuality requirement has therefore been met.

■ A more prominent issue, however, is whether the mutual claims asserted by Thompson and the Board arose before the bankruptcy case commenced. The Board's claim is based on the overpayments it made prepetition. It therefore arose before Thompson's bankruptcy intervened. Thompson suggests that he has a postpetition claim because he became eligible to receive the retirement benefits after his bankruptcy case commenced. We believe, however, that Thompson misapprehends current bankruptcy law. Section 553 of the Code does not recognize a right of setoff unless it involves a *prepetition* "debt" owed by a creditor and a *prepetition* "claim" against the same creditor. 11 U.S.C. § 553(a). A "debt" is defined as a "liability on a claim." *Id.* § 101(12). As the foregoing definition suggests, the term "debt" has "a meaning coextensive with that of 'claim' as defined in § 101(5)." *Johnson v. Home State Bank*, 501 U.S. 78, 84 n. 5, 111 S.Ct. 2150, 2154 n. 5, 115 L.Ed.2d 66 (1991). As noted above, "claim" is broadly defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . . ." *Id.* § 101(5)(A). The next step of our analysis then is to determine when Thompson's "right to payment" arose.

The Court of Appeals for the Fourth Circuit addressed a similar question in *Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir.1988), *cert. dismissed*, 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988). There, almost two months after the debtor filed its bankruptcy petition, a claimant commenced an action against the debtor to recover for injuries caused by one of the debtor's products. Although she started using the product before the debtor filed for bankruptcy, the claimant argued that her injuries became manifest after the bankruptcy case commenced. Therefore her claim arose postpetition and was not frozen by the automatic stay. The court of appeals, however, disagreed with her argument. It reasoned instead that her "right to payment" arose when she started using the debtor's product prepetition. This right to payment, of course, was "contingent" upon the manifestation of injury. *Id.* at 203. Nevertheless, because the Bankruptcy Code's definition of "claim" included "contingent" claims, the court of appeals determined that the claimant's cause of action arose prepetition and was thus subject to the automatic stay. *Id.* Although *Grady* involved a tort claim, the court of appeals has indicated in a subsequent decision that the *Grady* analysis applies to claims relating to contracts. *See Cooper v. Delaware Valley Shippers (In re Carolina Motor Express, Inc.)*, 949 F.2d 107, 111 n. 4 (4th Cir.1991), *rev'd on other grounds sub nom. Reiter v. Cooper*, —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993).

Following *Grady*, we believe that Thompson's right to payment for retirement benefits arose when he joined the police department in 1969, and thus became a participant in the plan. To be sure, at the time Thompson filed his petition, his right to receive retirement benefits depended on his obtaining 25 years of creditable service. Yet this 25–year requirement was merely a contingency Thompson had to meet in order to have an immediate right to payment. *See In re Lewis*, 157 B.R. 253, 255 (Bankr.E.D.Va. 1993) (describing a "contingent liability" as "one that the debtor will be called upon to pay only upon the occurrence of 'an extrinsic event' which will trigger liability"). "A debt can be absolutely owing prepetition even though that debt would never have come into existence except for postpetition events." *United States v. Gerth*, 991 F.2d 1428, 1434 (8th Cir.1993); *see also Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030, 1036 (5th Cir.1987) ("The character of a claim is not transformed from prepetition to postpetition simply because it is contingent, unliquidated, or unmatured when the debtor's petition is filed." (quoting *Stair v. Hamilton Bank (In re Morristown Lincoln–Mercury, Inc.)*, 42 B.R. 413, 418–19 (Bankr.E.D.Tenn.1984))). Thompson's claim therefore arose prepetition, even though it was merely "contingent" as of the petition date. Since the claims at issue here arose prepetition and are mutual obligations, we conclude that the Board has a right of setoff preserved by 11 U.S.C. § 553(a).[2]

 Thompson contends that the Board cannot exercise its right of setoff because he has claimed his retirement benefits exempt under Va.Code § 34–34 (Michie Supp.1994).[3] Generally, a right of setoff cannot be exercised against the exempt assets of the debtor. *See In re Cole*, 104 B.R. 736

---

2. Last year, the Court of Appeals for the Fourth Circuit again addressed the question of when a claim arises. *See River Place East Housing Corp. v. Rosenfeld (In re Rosenfeld)*, 23 F.3d 833 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994). At issue in *Rosenfeld* was whether housing cooperative dues were personal obligations that arose prepetition and were thus dischargeable. A covenant running with the land obliged the debtor (who owned shares in the cooperative) to pay the dues as they were assessed. The court of appeals held that the obligation to pay the dues was a function of owning the land upon which the covenant ran. Consequently, the obligation to pay the dues arose postpetition inasmuch as the debtor continued to own the property postpetition. *Id.* at 837. As the foregoing suggests, *Rosenfeld* is factually distinguishable from the case at hand.

3. Thompson also specifies "federal law" as a basis for his exemption. However, his reliance on "federal law" is misplaced, for Virginia has opted out of the federal exemption scheme. *See* 11 U.S.C. § 522(b)(1); Va.Code § 34–3.1 (Michie 1990). Thompson also uses a Fairfax County ordinance as a basis for the exemption. Yet we are not convinced that this ordinance was intended to be part of Virginia's exemption scheme. Consequently, we find that his reliance on the ordinance is also misplaced.

(Bankr.D.Md.1989); *In re Wilde*, 85 B.R. 147 (Bankr.D.N.M.1988). The exemption law applicable here is Va.Code § 34–34(C), which allows an individual to exempt a retirement-plan interest only to the extent this interest provides an annual benefit up to $17,500. Thompson has provided only nominal values for his claimed exemption. According to his bankruptcy schedules, his interest in the retirement plan is worth $1.00 and the amount claimed exempt is likewise $1.00. At best, it is unclear whether Thompson claims only $1.00 of his interest as exempt, or whether he claims the full value of his interest, whatever that may be, as exempt. Although we interpret Virginia's exemption statutes liberally, any ambiguities found in the debtor's schedules are construed against the debtor. *Addison v. Reavis*, 158 B.R. 53, 59 (E.D.Va.1993), *aff'd by unpublished disposition*, 32 F.3d 562 (4th Cir.1994). Since filing his schedules, Thompson has made no attempt to amend his exemption upward to take advantage of the maximum claim available under Va.Code § 34–34. Consequently, the only portion of his interest that is exempt is $1.00. *See Addison*, 158 B.R. at 57–58. The Board may therefore exercise its right of setoff only insofar as the value of Thompson's interest exceeds $1.00. *Cf. id.* at 61.

### C.

■ Before the Board may exercise its right of setoff, it must first surmount the barriers presented by the discharge injunction and the automatic stay. At the outset, we observe that in bankruptcy, "[a]n allowed claim of a creditor ... that is subject to setoff under section 553 ... is a secured claim ... to the extent of the amount subject to setoff...." 11 U.S.C. § 506(a). Thus, as a general proposition, a "[s]etoff ... elevates an unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim against the creditor." *Lee*, 739 F.2d at 875. The Board's secured status is significant insofar as a secured claim can survive a bankruptcy discharge. A discharge affects a debtor's liability *in personam*. It "operates to permanently stay any attempt to hold the debtor personally liable for discharged debts." *River Place East Housing Corp. v. Rosenfeld (In re Rosenfeld)*, 23 F.3d

833, 836 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994). Unless a security interest or lien is avoided, a discharge has little, if any, impact on a creditor's ability to proceed *in rem* against the property securing the claim. *See Johnson v. Home State Bank*, 501 U.S. 78, 82–83, 111 S.Ct. 2150, 2153, 115 L.Ed.2d 66 (1991) ("[The Bankruptcy] Code provides that a creditor's right to foreclose on the mortgage survives or passes through the bankruptcy."); *Farrey v. Sanderfoot*, 500 U.S. 291, 297, 111 S.Ct. 1825, 1829, 114 L.Ed.2d 337 (1991) ("Ordinarily, liens and other secured interests survive bankruptcy."). Consistent with this overall principle, a right of setoff recognized by 11 U.S.C. § 553 survives a discharge just as much as a claim secured by a mortgage or any other lien. *See Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1539 (10th Cir.1990) (per curiam).

■ Again, we emphasize that a claim is secured only "to the extent of the amount subject to setoff...." 11 U.S.C. § 506(a). This means that if the Board's claim exceeds the value of Thompson's claim, a portion of the Board's claim will be unsecured and thus subject to discharge. The amount of the Board's claim has been established in prior proceedings. On the other hand, Thompson's interest in the retirement fund represents a right to a stream of monthly payments. Other than the $1.00 exemption discussed above, no present value has been assigned to Thompson's interest. Accordingly, for purposes of discharge, it is necessary to fix the present value of Thompson's claim, which will enable us to determine which portion of the Board's claim is secured and which portion of the claim is unsecured. We therefore instruct the Board to prepare and present a proposed final order memorializing our decision and fixing the amount of the claim held by Thompson. We will also schedule this matter for further hearing at which time the Board may present its proposed final order. If Thompson objects to the amount fixed by the Board, he may appear at the hearing as well, and the Court will then make a finding as to the amount of Thompson's claim.

■ Having addressed the discharge injunction, we turn to the next roadblock confronting the Board, which is the automatic stay. As mentioned above, the stay prohibits any attempts by creditors to exercise their respective setoff rights. *See* 11 U.S.C. § 362(a)(7). Accordingly, a creditor must ask the court to lift the stay before exercising a right of setoff. Otherwise, as explained before, a party injured by a willful violation of the stay can recover damages. *Id.* § 362(h). In this instance, the stay was in effect from December 1993, when Thompson filed his petition, to April 1994, when Thompson received his discharge. *See id.* § 362(c)(2)(C). Thompson therefore seeks damages and attorney's fees for the time the stay was in effect. In response, the Board has asked that the stay be lifted.

■ Based on the circumstances of this case, we believe the appropriate course of action is to grant relief from the stay retroactively, making such relief effective as of the petition date, December 29, 1993. Section 362(d) provides that a court may grant relief from the stay "such as by terminating, *annulling,* modifying, or conditioning such stay...." *Id.* § 362(d) (emphasis added). The term "annulling" in the statute "indicates a legislative intent to apply certain types of relief retroactively and validate proceedings that would otherwise be void *ab initio." In re Siciliano,* 13 F.3d 748, 751 (3d Cir.1994); *see also Schwartz v. United States (In re Schwartz),* 954 F.2d 569, 572 (9th Cir.1992) ("[S]ection 362 gives the bankruptcy court wide latitude in crafting relief from the automatic stay, including the power to grant retroactive relief from the stay."); *Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178 (5th Cir.1989) ("The power to annul authorizes the court to validate actions taken subsequent to the impressing of the section 362(a) stay."); *Khozai v. RTC,* 177 B.R. 524, 527 (E.D.Va.1995) (holding that bankruptcy courts have the power to nullify the stay retroactively).

■ As noted above, we believe "cause" exists under § 362(d)(1) for lifting the stay retroactively. In addition to protecting debtors, the stay is also designed to safeguard the interests of creditors by preventing a "race to the courthouse" that would otherwise dissipate property held by the estate. We have already noted, however, that the retirement plan before us is an ERISA plan protected by an anti-alienation clause, which effectively shields the plan's assets from the reach of outside creditors. Such a provision is enforceable inside bankruptcy. *See* 11 U.S.C. § 541(c)(2); *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *In re Hanes,* 162 B.R. 733 (Bankr. E.D.Va.1994). Consequently, the Board's efforts to collect the overpayments have not injured any other creditors, since the plan's assets have never been available to outside creditors in the first place.

Even more important are the equities presented here. A cursory review of the bankruptcy schedules reveals that Thompson has very few creditors and has even fewer, if any, non-exempt assets from which a distribution can be made. In this instance, Thompson has not pursued bankruptcy as a way of addressing the demands of many unsecured creditors. Instead, Thompson has tried to use the automatic stay as leverage for obtaining benefits he could not otherwise receive outside of bankruptcy. Accordingly, the circumstances of this case dictate that we enter an order annulling the automatic stay, effective as of the petition date. Because an annulment of the stay has the effect of validating the Board's actions, we find that no "violation" of the stay has occurred. Consequently, Thompson is unable to recover damages and fees under 11 U.S.C. § 362(h). We will therefore dismiss the adversary proceeding commenced by Thompson.

### III.

For the foregoing reasons, we find that although the Board cannot effectuate a recoupment, it does have a right of setoff recognized by 11 U.S.C. § 553, which provides that all or part of its claim is secured and thus survives a bankruptcy discharge. Based on the circumstances described above, we annul the automatic stay effective as of the petition date, and dismiss the adversary proceeding brought by Thompson. This matter is continued to the 20th day of June, 1995, for presentation by counsel for the

Board of a proposed final order memorializing our decision and fixing the present value of Thompson's claim, as set forth above.