**In the Matter of William C. EYKE, Jr., Debtor.**

**Bankruptcy No. HG 98–08726.**

United States Bankruptcy Court, W.D. Michigan.

March 28, 2000.

Charles R. Toy, East Lansing, Michigan, for CBI Copy Products–Muskegon, Inc.

Perry G. Pastula, Grand Rapids, Michigan, for William Eyke, Jr.

Larry A. Ver Merris, Grand Rapids, Michigan, for James W. Hoerner, Trustee.

Jeff A. Moyer, Grand Rapids, Michigan, for Ila White and the Ilafae T. White Trust.

*OPINION REGARDING WHETHER PAYMENTS FROM NONCOMPETITION AGREEMENT ARE PROPERTY OF THE ESTATE AND WHETHER CREDITOR IS ENTITLED TO RECOUP AGAINST PAYMENTS DUE UNDER THE AGREEMENT*

JAMES D. GREGG, Chief Judge.

## I. ISSUES

Are postpetition payments to be made to the Debtor in accordance with a prepeti-

tion noncompetition agreement property of the bankruptcy estate? May the creditor which is obligated to make payments under such agreement, whether to the Debtor or the estate, exercise recoupment to reduce or eliminate the postpetition payments?

## II. JURISDICTION

The court has jurisdiction over this case pursuant to 28 U.S.C. § 1334. Pursuant to 28 U.S.C. § 157(a) and Local Rule 83.2(a) of the United States District Court for the Western District of Michigan, the case and this matter have been referred to this court. The matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E) and (O) because it pertains to the administration of the estate, the determination of the property of the estate, and the adjustment of the debtor-creditor relationship.

## III. PROCEDURAL BACKGROUND

On October 2, 1998, William C. Eyke, Jr. ("Debtor") filed a voluntary petition under chapter 7 of the Bankruptcy Code.[1] On October 13, 1998, James Hoerner was appointed as the chapter 7 trustee ("Trustee").

On March 9, 1999, the Trustee filed his "Motion for Extension of Time to Accept or Reject Noncompetition Agreement as a Possible Executory Contract or to Have Court Otherwise Determine the Nature Thereof for a Period of 60 Days" ("Trustee's Motion"). On June 28, 1999, creditor CBI Copy Products—Muskegon, Inc. ("CBI") filed its "Motion for Relief from Automatic Stay and to Allow Recoupment and/or Offset" ("Recoupment Motion"). The parties have submitted legal memoranda on the issues presented. The court conducted an evidentiary hearing on October 15, 1999 at which it admitted exhibits, heard the testimony of witnesses, and considered legal argument from opposing counsel. At the conclusion of that hearing, the court permitted counsel thirty days to submit any supplemental memoranda or written closing argument.

## IV. FACTS

Prior to July, 1998, the Debtor held all the stock in The Copy Center, Inc. ("Copy Center"). *See*, "Stipulation as to Admissibility of Exhibits and Statement of Facts" with attached "Statement of Facts" dated October 15, 1999 at 1 (hereinafter "Stip. at ___") and Transcript of October 15, 1999 hearing at 68 (hereinafter "Tr. at ___"). At some unspecified time, the Debtor and CBI entered into negotiations for the sale of certain Copy Center assets to CBI. A closing on the sale was initially set for June 30, 1998, but did not take place on that date. Tr. at 81. The closing was postponed approximately two weeks to July 15, 1998. *Id.*

At closing, the Copy Center and CBI entered into an Asset Purchase Agreement ("Purchase Agreement"). Tr. at 68–69, Stip. at 1, and Exhibit 1 (hereinafter "Ex. ___"). The assets purchased under the Purchase Agreement included trade secrets, customer lists, good will, other confidential information, and all rights to the trade name "Copy Center." Stip. at 1, Ex. 1. The assets purchased also included tools, tool kits, and certain furniture and fixtures. The Purchase Agreement excluded inventory and other assets of the Copy Center. Stip. at 1, Ex. 1.

The Purchase Agreement recited certain facts:

A. [Copy Center] is significantly indebted to Old Kent Bank, a Michigan Banking Corporation ("Old Kent"), which indebtedness is in default and is secured by a first position security interest in all of [Copy Center's] assets and properties.

B. [Copy Center] is significantly indebted to other parties ("Junior Creditors"), some of which indebtedness is secured and in default.

1. The Bankruptcy Code ("Code") is set forth in 11 U.S.C. §§ 101–1330. Unless otherwise noted, all further statutory references are to the Code.

C. [Copy Center] wishes to liquidate its business and assets and make provision for the orderly payment of a portion of its indebtedness.

D. Old Kent wishes to realize on its first priority security interest and sell the collateral at private sale, all as provided under Article 9 of the Uniform Commercial Code, as adopted in Michigan.

E. [Copy Center] wishes to cooperate with Old Kent so as to facilitate an orderly liquidation of its business in the desire to provide for its employees and creditors.

Ex. 1 at p. 1.

Paragraph 4 of the Asset Purchase Agreement further states:

2. *Indemnification and Offset*

(a) *Agreement to Indemnify.* [Copy Center] agrees to indemnify and hold [CBI] harmless from and against any and all claims, expenses or liabilities, including the costs incurred to defend against any such claim, in excess of the proceeds of insurance therefor;

(1) for which [Copy Canter] is liable; or,

(2) which relate to [Copy Center's] ownership or use of the Purchased Assets; or,

(3) which relate to the operation of the business of the [Copy Center] before the Closing Date; or,

(4) arising out of circumstances which constitute a breach of the representations, warranties, or covenants set forth in this Agreement and Schedules hereto.

(b) *Limitation on Indemnity.* [CBI's] rights of indemnity hereunder will be limited to the amounts collected on the Accounts Receivable. Further, no claim for indemnity may be brought after June 30, 1999.

Ex. 1 at p. 3.

As part of the July 15, 1998 closing, the Purchase Agreement was assigned to Old Kent Bank. Ex. 1 at p. 8, Stip. at 3. The bank in turn conveyed certain assets to CBI pursuant to a Bill of Sale also dated July 15, 1998. Ex. 2, Stip. at 3.

As part of the closing, the Debtor entered into an Employment Agreement and a Noncompetition Agreement ("Noncompetition Agreement") with CBI. In relevant part, that agreement provided:

In consideration for [the Debtor's] not competing with CBI, CBI will pay [the Debtor] the sum of Eighty–Seven Thousand Dollars ($87,000.00), in equal monthly installments of Three Thousand Dollars ($3,000.00) each, commencing January 31, 1999, and continuing through May 31, 2001. *Any amounts owing to [the Debtor] by CBI hereunder may be offset against any obligation of The Copy Center, Inc., under the indemnification provisions of Section 4 of a certain Asset Purchase Agreement, of even date herewith, between CBI and said Copy Center.*

Stip. at 3, Ex. 3, Ex. 4 at ¶ 2 (emphasis added).

On October 2, 1998, the Debtor filed his voluntary petition for relief under chapter 7 of the Bankruptcy Code. On January 21, 1999, this court granted the Debtor's discharge.

Neither the Debtor's Schedules nor his Statement of Financial Affairs disclosed the Noncompetition Agreement or the future payments due thereunder. This information was also not disclosed at the time of the § 341 meeting. It was not until January, 1999, that the Trustee first learned of the Noncompetition Agreement.

Meanwhile, on October 15, 1998, Ilafae T. White ("White") brought an action against CBI in the Circuit Court for the County of Kent, State of Michigan, (the "circuit court"). Stip. at 4. White is the Debtor's largest creditor and is a junior secured creditor subordinate to Old Kent Bank regarding the assets previously owned by the Copy Center and subject of the Purchase Agreement. The circuit

court complaint filed by White against CBI alleges she is entitled to claim and delivery and alleges conversion of certain collateral, including the assets sold to CBI pursuant to the Purchase Agreement. Stip. at 4, Ex. 6.

CBI has incurred attorney fees and other costs, in White's circuit court action, which CBI contends are subject to the indemnification and offset provisions in the Purchase Agreement, as well as the "offset" provision in the Noncompetition Agreement. Stip. at 4. CBI's Recoupment Motion asserts it is entitled to recover the April 1999 Noncompetition Agreement payment of $3,000.00 being held by the Trustee[2]. CBI also seeks to recoup future monthly installments due under the Noncompetition Agreement.[3] The parties have stipulated that the total accounts receivable collected exceed the $87,000.00 due on the Noncompetition Agreement. Tr. at 76.[4]

## V. DISCUSSION

### A. *Are Postpetition Payments Made to the Debtor Pursuant to a Noncompetition Agreement Property of the Bankruptcy Estate?*

■ The Trustee's Motion seeks to have this court determine that postpetition payments made by CBI to the Debtor under the Noncompetition Agreement are property of the bankruptcy estate. The Debtor, on the other hand, contends that these postpetition payments are not property of

2. There is no disagreement that the $3,000.00 payments for January, February, and March of 1999 were timely made by CBI to the Debtor. Neither CBI's Recoupment Motion nor its Trial Brief seek recovery of this $9,000.00 previously paid to the Debtor. However, the stipulated Statement of Facts asserts that CBI seeks to recover this amount. Stip. at 4. The court will rely upon CBI's motion and brief as the accurate representation of the relief it seeks.

3. In its Recoupment Motion, CBI claimed a then-current indebtedness of $37,104.51. That amount would be reduced by $3,000.00 monthly, starting in May of 1999 when CBI

the estate. The Bankruptcy Code broadly defines property of the estate but excludes a debtor's postpetition earnings:

> The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> \*    \*    \*    \*    \*    \*
>
> (6) Proceeds, product, offspring, rents, or profits of or from property of the estate, *except such as are earnings from services performed by an individual debtor after the commencement of the case.*

11 U.S.C. § 541(a)(6) (emphasis added).

Is a debtor's continued compliance with a noncompetition agreement "services performed by an individual debtor" thereby excluding postpetition payments from property of the estate?

In *Andrews v. Riggs Nat'l Bank (In re Andrews)*, 80 F.3d 906 (4th Cir.1996), the Fourth Circuit addressed whether payments to a debtor pursuant to a non-competition agreement constitute "earnings from services performed" under § 541(a)(6). In part, the Fourth Circuit used the bright line analysis set forth in *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966), where the question was whether loss-carryback tax refunds should be included in a debtor's bankruptcy estate.[5] In *Segal*, the refunds stemmed from losses incurred by the debtor prior to the bankruptcy filing. The

began withholding payment to the Trustee. The indebtedness is tied to the reasonableness of CBI's attorney fees. The amount of CBI's attorney fees and whether they are "reasonable" was bifurcated from this matter and will be addressed, if necessary, on a later date. Stip. at ¶ 2, Tr. at 6.

4. Paragraph 4(b) of the Purchase Agreement limits CBI's right of indemnity to the amounts collected on accounts receivable.

5. Segal was decided under § 70a(5) of the Bankruptcy Act, the predecessor to § 541 of the Code.

Supreme Court held that the refunds were properly included in the estate because they were "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start." *Andrews*, 80 F.3d at 910 (citing *Segal*, 382 U.S. at 380, 86 S.Ct. at 515). *Andrews* concluded that payments due under a noncompetition agreement fell "clearly on the pre-bankruptcy or 'past' side of the bright line" and were property of the estate because they were "plainly rooted in, and [grew] out of, [debtor's] pre-petition activities". *Id.* If a court were to rule otherwise, "debtors would be able, indeed invited, to circumvent the bankruptcy laws through clever use of agreements not to compete." *Id.* at 911.

The Seventh Circuit Court of Appeals has reached to a similar conclusion in a slightly different context. That appellate court analogized the value of goodwill transferred in the sale of a business to a covenant not to compete:

> The value of [the debtor's] goodwill represents future cash flows not from earnings for future services actually performed by [the debtor], but from return on an intangible capital asset that could be sold and transferred with the sale of the practice. The value of [the debtor's] goodwill is therefore not excluded from the estate by virtue of § 541(a)(6). . . .

*In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996), *cert. denied*, 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996).

Other courts have reached the same conclusion. *See, e.g., Johnson v. Taxel (In re Johnson)*, 178 B.R. 216 (9th Cir. BAP 1995) ("[a]pplying the *Segal* test to the present case it is clear that the anti-competition payments are sufficiently rooted in

the pre-bankruptcy past to be included in the estate."); *In re Schneeweiss*, 233 B.R. 28 (Bankr.N.D.N.Y.1998) (agreeing with courts which have concluded that payments received in consideration of not competing do not constitute "earnings from services performed"); *Grochocinski v. Dunkley (In re Dunkley)*, 1999 WL 669252 (Bankr.N.D.Ill. Aug. 24, 1999) (holding payments made postpetition pursuant to covenant not to compete as part of installment sale price constitute property of the bankruptcy estate).

This court agrees with those decisions which have determined that postpetition payments made pursuant to a prepetition noncompetition agreement are property of the estate. Therefore, this court holds that postpetition payments made, or to be made, by CBI to the Debtor are property of the Debtor's bankruptcy estate.

**B.** *Is the Noncompetition Agreement an Executory Contract?*

The Debtor also argues that the Noncompetition Agreement is an executory contract which cannot be assumed by the Trustee pursuant to 11 U.S.C. § 365(c)(1).[6] The Debtor asserts that CBI would be excused from accepting performance under the Noncompetition Agreement from anyone other than him. The Debtor argues that only he can "perform" under the Noncompetition Agreement by not competing with CBI. This same argument has been previously addressed and persuasively rejected.

> Despite the fact that [the debtor] need not do anything to comply with the covenant not to compete, [the debtor] contends his compliance must be personal services because it can be performed

---

**6.** That section reads, in part:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1) (A) applicable law excuses a party, other than the debtor, to such contract or

lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment[.]

only by him. This argument sounds convincing until one realizes that [debtor] can comply with the covenant even when dead.... We conclude that compliance with a[sic] anticompetition agreement is not "services performed" because refraining from the performance of services is not the performance of services.

*Johnson,* 178 B.R. at 220.

▮ The term "executory contract" is not defined in the Bankruptcy Code. The widely quoted definition of an executory contract was formulated by Professor Countryman. He defined it as one:

under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973). The Countryman definition was acknowledged by the Sixth Circuit in *Terrell v. Albaugh (In re Terrell),* 892 F.2d 469 at n. 2 (6th Cir.1989). The *Terrell* opinion also acknowledged *Chattanooga Memorial Park v. Still (In re Jolly),* 574 F.2d 349 (6th Cir.1978), *cert. denied* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). In *Jolly,* the Sixth Circuit developed what is now generally referred to as the "functional approach" for determining whether a contract should be deemed executory. This "functional approach" involves an evaluation of the purposes rejection is expected to accomplish, namely:

1) taking advantage of contracts which will benefit the estate; 2) relieving the estate of burdensome contracts; 3) promoting the debtor's fresh start; 4) permitting the allowance and determination of claims; and 5) preventing parties from remaining "in doubt concerning their status vis-a-vis the estate." (citations omitted).

7. Although the Thirteenth Amendment prohibits a court from specifically enforcing a personal service contract, an agreement not

*In re Drake,* 136 B.R. 325, 327 (Bankr. D.Mass.1992).

Under the Countryman definition, the Noncompetition Agreement does not require any future "performance" on the part of the Debtor. The Debtor could comply with the Noncompetition Agreement even if he were dead. Further, a court can require the Debtor's continued compliance with the Noncompetition Agreement by issuing a negative injunction which prohibits him from engaging in an activity which violates the Noncompetition Agreement. *See, Andrews,* 80 F.3d at 912.[7]

The functional analysis by the Sixth Circuit in *Jolly* is also inapposite:

Given the primary purposes of rejection, relieving the estate of burdensome obligations while the Debtor is attempting to recover financially and affecting a breach of contract allowing the injured party to file a claim, it is clear that those purposes cannot be accomplished through rejection. Therefore, using the functional approach formulated by the Sixth Circuit in *In re Jolly,* ... the conclusion is inescapable: the [employment and noncompetition] Agreement cannot be deemed executory.

*Drake,* 136 B.R. at 328.

This court determines that the Noncompetition Agreement is not an executory contract. The Trustee is not required to assume or reject it. Therefore, the nonexecutory nature of the contract has no possible effect on whether the postpetition payments are property of the bankruptcy estate.

C. *Is CBI Entitled to Recoup Against the Noncompetition Agreement Payments?*

1. *Recoupment Requirements.*

▮ CBI seeks setoff or recoupment against the $3,000 payment previously

to compete is specifically enforceable if it is reasonable. *Andrews,* 80 F.3d at 912.

made to the Trustee and all future payments to be made under the Noncompetition Agreement.[8] Setoff is an equitable right of a creditor to deduct a debt it owes from a claim it has against the debtor arising out of a separate transaction.[9] Recoupment differs in that the opposing claims must arise from the same transaction. *Schachter v. Tolassi (In re 105 East Second St. Assocs.)*, 207 B.R. 64, 68 (Bankr.S.D.N.Y.1997).

■ Courts generally agree that the trustee of a bankruptcy estate takes the property subject to rights of recoupment. *See, e.g., Holford v. Powers (In re Holford)*, 896 F.2d 176, 179 (5th Cir.1990) (citing *In re Career Consultants*, 84 B.R. 419, 426 (Bankr.E.D.Va.1988)). Recoupment is an equitable doctrine that has long been utilized in the bankruptcy context. *Herod v. Southwest Gas Corp. (In re Gasmark Ltd.)*, 193 F.3d 371, 374 (5th Cir. 1999) (citing *In re U.S. Abatement Corp.*, 79 F.3d 393, 398 (5th Cir.1996)). In *Gasmark*, it was stated recoupment "allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim." *Id.* at 374 (citing *Abatement*, 79 F.3d at 398). But the Fifth Circuit also requires "inequity":

> [T]he fact that identical parties are engaged in transactions of a similar subject matter may not be enough to permit recoupment. The obligations must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations.

193 F.3d at 374–75. See *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1403 (9th Cir.1996) (In bankruptcy, recoupment should only be applied when "it would ... be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations"); *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3d Cir.1992) (same).

2. *What Constitutes the "Same Transaction?"*

■ Courts have also addressed what constitutes the "same transaction" or a "single integrated" transaction. Some courts have equated "same transaction" with "same contract." *See Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984). Others look to the contractual relationship between the debtor and the creditor with a broader view of "same transaction" or require that the debts "arise out" of that relationship. *See Sapir v. Blue Cross/Blue Shield of Greater New York (In re Yonkers Hamilton Sanitarium)*, 34 B.R. 385, 386–387 (S.D.N.Y.1983); *Waldschmidt v. CBS, Inc. (In re Waldschmidt)*, 14 B.R. 309, 314 (M.D.Tenn.1981). "When the circumstances that gave rise to the credit and those giving rise to the creditor's obligation to the debtor do not result from a set of reciprocal contractual obligations or from the same set of facts, they are not part of the same transaction." *Malinowski v. New York State Dept. of Labor (In re Malinowski)*, 156 F.3d 131, 134 (2d Cir.1998). However, the same appellate court has also stated "recoupment in bankruptcy may occur only within a single contract or transaction or a single set of transactions." *New York State Electric and Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir.1997). This court is faced with the factual issue of whether a single integrated transaction exists in this matter.

---

**8.** CBI's Recoupment Motion does not seek recovery of the three payments totaling $9,000.00 made to the Debtor in January, February, and March of 1999. *See*, n. 2 *supra*. Remedies which CBI may have regarding those prior payments, if any, are not now before this court and shall not be considered.

**9.** Because, for the reasons discussed below, separate transactions do not exist, and because the requisite element of mutuality is lacking, setoff is impermissible and will not further be considered by this court.

In *Newbery Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d 1392 (9th Cir.1996), the Ninth Circuit utilized the "logical relationship" test outlined by the Supreme Court in *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). In *Moore,* the Court stated that " '[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." 270 U.S. at 610, 46 S.Ct. at 371, 70 L.Ed. 750.

In this matter, the Purchase Agreement and the Noncompetition Agreement were executed on the same day. Both documents arose out of the sale of assets by the Copy Center through Old Kent Bank to CBI. As a practical matter, the sale price was divided between the Copy Center (with its funds earmarked for Old Kent Bank) and Copy Center's sole shareholder, the Debtor. In connection with the transaction, it was provided that CBI would be indemnified by the *Debtor,* from payments under the Noncompetition Agreement, pursuant to the applicable section of the Purchase Agreement.[10]

There is a logical relationship between the Purchase Agreement and the Noncompetition Agreement. Because those agreements are necessarily intertwined, the court finds they constitute a single integrated transaction for recoupment purposes. The court also finds it is not inequitable for CBI to exercise recoupment in these circumstances. To rule otherwise would result in an unwarranted windfall to the Debtor's estate at the expense of CBI in derogation of the integrated prepetition agreements. Therefore, the court holds that CBI may recoup its liability (*i.e.,* the

attorneys' fees incurred, or to be incurred, in connection with the White circuit court litigation) from the Noncompetition Agreement payments owed to the Debtor's estate.

### 3. *Recoupment: Payments Previously Made Versus Future Payments.*

CBI seeks to recover $3,000 that it has already paid to the Trustee. If recoupment applies, "a [party] is entitled to claim, *by way of deduction,* all just allowances or demands accruing to him in respect of the same transaction that forms the ground of the action." *Pennsylvania R Co. v. Miller,* 124 F.2d 160, 162 (5th Cir.1941), *cert. denied,* 316 U.S. 676, 62 S.Ct. 1047, 86 L.Ed. 1750 (1942) (emphasis added). Recoupment "is not in the nature of a cross demand, but rather it lessens or defeats any recovery by the [other party]." *Id.* Therefore, CBI, having voluntarily made the $3,000 payment to the Trustee, is unable to affirmatively recover that payment. Its ability to seek to deduct an amount already paid is extinguished.

However, with regard to future payments to be made under the Noncompetition Agreement, the court holds that the remedy of recoupment may be utilized by CBI. Deductions equal to the amount of CBI's liability for the already incurred and future attorneys' fees may be made.[11]

### VI. CONCLUSION

The Noncompetition Agreement is not an assumable executory contract. Postpetition payments previously made, and payments prospectively due, under the Noncompetition Agreement, are property of

---

**10.** See the quoted language from the Purchase Agreement and the Noncompetition Agreement at pp. 4–5, *supra.* The court also finds that possible indemnification from Copy Center to CBI would be futile. Copy Center was ceasing business and its asset sale proceeds were paid to Old Kent Bank to reduce or eliminate Copy Center's secured indebtedness. The risk to indemnify CBI was placed upon Copy Center's principal, the Debtor.

**11.** At this time, the total amount of the attorneys' fees to be paid by CBI regarding the White circuit court litigation is unknown. Therefore, the actual amount that may be ultimately recouped by CBI will be determined, to the extent necessary, at a future hearing. *See* n. 3, *supra.*

the bankruptcy estate. CBI is entitled to utilize recoupment to deduct its liability for attorneys' fees from future payments to be made by it under the Noncompetition Agreement. However, CBI may not recoup the $3,000 payment previously made to the Trustee. A separate order shall be entered accordingly.