**In re GEORGETOWN STEEL COMPANY, LLC, Debtor.**

**Georgetown Steel Company, LLC and Cananwill, Inc., Plaintiffs,**

**v.**

**Capital City Insurance Company, Inc., Defendant.**

**C/A No. 03–13156–W.**
**Adversary No. 03–80544–W.**

United States Bankruptcy Court,
D. South Carolina.

April 28, 2004.

**316**

Michael M. Beal, Lead Attorney, Columbia, SC, for Debtor.

Joseph F. Buzhardt, III, Office of the United States Trustee, Columbia, SC, for trustee.

### ORDER

JOHN E. WAITES, Bankruptcy Judge.

**THIS MATTER** came before the Court for hearing upon the filing of an Adversary Complaint filed by Georgetown Steel Company, LLC ("Debtor") and an Amended Adversary Complaint of Debtor and Cananwill, Inc. (collectively the "Complaint").[1] The Complaint seeks an Order: (1) enjoining Capital City Insurance Company, Inc. (the "Carrier") from any postpetition cancellation of its workers' compensation insurance policy (the "Policy") based on prepetition claims without moving for and obtaining an order from this Court granting such relief; (2) directing Carrier to immediately remit a refund in the amount of $1,960,001 to Cananwill, Inc. ("Cananwill"); (3) enjoining Carrier from offsetting any portion of the alleged Refund; (4) ruling that the Loss Sensitive Rating Plan ("LSRP") Endorsement is invalid and unenforceable as to the first Policy coverage period and any additional LSRP Premium due and owing is $0; (5) ruling that the LSRP Endorsement is invalid and unenforceable as to the current or second Policy coverage period and no LSRP Premium is due and owing thereunder; and (6) for such other and further relief as is just and proper. Debtor also asserts that Carrier violated the automatic stay pursuant to 11 U.S.C. § 362. The Carrier opposes the relief sought and asserted affirmative defenses of setoff, or alternatively recoupment, for anything it is determined to owe Debtor against what Debtor owed to Carrier.

Having considered the record of the case including the pleadings, the arguments of counsel, and the testimony of witnesses, the Court makes the following findings of fact and conclusions of law.[2]

---

1. Inasmuch as Debtor and Cananwill, Inc. have jointly tried this matter and submitted joint pleadings, when referring to arguments of both Plaintiffs, the Court will, unless otherwise stated, generally refer to "Debtor" for ease of reference.

2. The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## FINDINGS OF FACT

1. Debtor owns and operates a steel mill located in Georgetown, South Carolina (the "Steel Mill").

2. Cananwill is an insurance premium finance company whose business consists of lending money to companies to finance their insurance premiums.

3. The Carrier is licensed and authorized to provide insurance services in South Carolina (the "State") by the South Carolina Department of Insurance ("SCDOI").

4. The Carrier provides workers' compensation insurance to Debtor. The relationship commenced in 2002 when the Carrier provided coverage to the former operator and owner of the Steel Mill, Georgetown Steel Corporation ("Former Owner") prior to Debtor. In order to obtain workers' compensation coverage, the Former Owner employed AON Risk Services, Inc. of the Carolinas ("AON"). For a variety of reasons, the Former Owner was unable to obtain workers' compensation coverage in the voluntary insurance market. Consequently, AON, on behalf of the Former Owner, submitted an application for coverage under South Carolina's assigned risk workers' compensation program.

5. Pursuant to South Carolina law, the Former Owner (and later, Debtor) maintained a level of employees such that they were required to maintain workers' compensation insurance coverage. For those entities that cannot obtain workers' compensation coverage in the voluntary market, the State has an established "assigned risk" or "residual market." Rates for such a program are established by the State, and rules and procedures have been promulgated by the State as they relate to the assigned risk market—the South Carolina Workers Compensation Assigned Risk Plan, Operating Rules and Procedures (the "S.C. Plan"). The plan administrator for the residual market is the National Counsel on Compensation Program, Inc. ("NCCI").

6. Following submission of an application to SCDOI (or NCCI),[3] a procedure is followed for assignment to a particular approved carrier. In 2002, the Former Owner's application was eventually submitted to the Carrier, and the Carrier and the Former Owner entered into a workers' compensation policy for the period June 1, 2002 to June 1, 2003 (the "Prior Policy"). The Former Owner filed for bankruptcy protection, and the Prior Policy was assumed and assigned to Debtor as buyer of substantially all of the assets.

7. The Former Owner initially paid $1.1 million for coverage under the Prior Policy. The $1.1 million premium was subsequently increased to $2,044,281 as a consequence of accurate expense modification information and a 20% Loss Sensitive Rating Plan Premium ("LSRP").[4]

8. Debtor also paid an additional $291,256 premium payment for the Prior Policy, as a result of the Carrier's audits of the Former Owner's and Debtor's payroll records during and shortly after expiration of the Prior Policy term.

---

**3.** The submission of applications process changed slightly from 2002–2003. In 2002, applications were sent the SCDOI for distribution between two carriers, and in 2003 to NCCI for assignment among several carriers.

**4.** LSRP refers to a plan that adjusts the premium on a policy, following the policy term, based upon the actual occurrence of claims. There is a cap on the amount that can be assessed, as well as a potential for a limited return of premium. The existence and application of the LSRP is in dispute between the parties.

9. In the spring of 2003, Debtor anticipated the expiration of the Prior Policy and asked AON to attempt to obtain workers' compensation coverage for Debtor in the voluntary market. Testimony was presented concerning whether a certain quote received constituted a voluntary offer, but in the end Debtor was unable to procure voluntary workers' compensation coverage and AON, on behalf of Debtor, submitted an application to the NCCI for workers' compensation coverage through South Carolina's assigned risk program.

10. Around June 16, 2003, the Carrier issued a workers' compensation policy to Debtor for the period June 1, 2003 to June 1, 2004 (the "Current Policy").

11. Based on Debtor's estimates of payroll for the one-year period commencing June 1, 2003 and a 20% LSRP deposit, the cost of the Current Policy was $2,677,914.

12. In order to pay the premium, Debtor financed the premiums related to the Current Policy through a loan from Cananwill.[5] It is undisputed that the Carrier received notice with respect to Cananwill's interest in return premiums.

13. As a result of a retrospective audit of payroll for the Prior Policy period, the Carrier invoiced Debtor for $195,031 of additional premium for the Prior Policy (the "Audit Claim").

14. Debtor did not pay that amount when it was due and, on October 9, 2003, the Carrier's computer system automatically issued a notice of cancellation of the Policy.

15. Debtor eventually wrote and submitted a check dated October 14, 2003 to the Carrier for the $195,031 additional Audit Claim. After receiving Debtor's check for $195,031, the Carrier reinstated the status of Debtor's coverage on October 16, 2003.

16. On October 21, 2003, (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of South Carolina.

17. As of the petition date, Debtor continued to operate its business and manage its properties as a debtor and debtor-in-possession pursuant to §§ 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

18. On the Petition Date, Debtor ceased essentially all operations and reduced the number of employees from 500 to 52.

19. Although Debtor had issued a check for payment of the Audit Claim for the Prior Policy prior to the Petition Date, the check did not clear Debtor's banking institution prior to the commencement of Debtor's bankruptcy case and was not honored. As a result of the dishonored check, the Carrier's computer system automatically sent Debtor a second notice of cancellation on October 27, 2003. The second notice stated that the Carrier intended to cancel Debtor's current policy if Debtor did not pay the Audit Claim by December 2, 2003.

20. The parties have stipulated that the $195,031 Audit Claim is a valid and enforceable pre-petition claim that Debtor owes to the Carrier.

---

**5.** Debtor's indebtedness owed to Cananwill was $2,041,458.61 plus fees and costs as of the Petition Date. Debtor was also in arrears on its payment obligations to Cananwill as of that time. The Court has been informed that the indebtedness to Cananwill has been substantially reduced as a result of Debtor's adequate protection payments to Cananwill as approved by the Court.

21. After the Petition Date, Debtor asked AON to seek a recalculation of the premiums under the Current Policy and turnover of the excess premium from the Carrier based on Debtor's actual payroll figures from June 1, 2003 to the Petition Date of October 21, 2003 and revised and reduced estimated payroll from October 22, 2003 through the end of the Current Policy period. As a result, the Carrier requested that AON forward Debtor's revised payroll information to the Carrier.

22. On November 5, 2003, AON sent Debtor's actual payroll amounts through October 21, 2003 and estimates of payroll for October 22, 2003 through June 1, 2004 to the Carrier.

23. At or about the same time, the Carrier advised AON telephonically that Debtor owed the Carrier an additional premium for the Prior Policy because of an LSRP provision contained in the Prior Policy. The Carrier asserted that Debtor owed $1.5 million on the Prior Policy under the LSRP endorsement that provided for a retroactive premium based on actual losses incurred during the Prior Policy's coverage period.

24. As a follow-up to the telephone conversation, on November 11, 2003, the Carrier sent a letter, with attachments, stating:

Based on the payroll projections you provided from the insured, once the current term is endorsed, there will be credit on the account of $1,960,000. We will send the finance company, Cananwill, a refund of $971,933.12 representing the unpaid installments. The remaining $988,067.88 will be applied to the LSRP Calculation [for the Prior Policy] ... This leaves a balance due on the account of $366,750.12.

We'll be processing the above within the next week. The balance of $366,450.12 will need to be paid prior to the cancella-

tion date of 12/2/03 in order for the policy to be reinstated.

25. In the November 11, 2003 letter, the Carrier also asserted that Debtor still owed the $195,031 Audit Claim, along with an additional LSRP premium totaling approximately $1.16 million after the initial 20% LSRP deposit was subtracted.

26. Shortly after the November 11, 2003 letter, the Carrier was contacted by Debtor's counsel concerning its attempts to offset the Audit Claim and the LSRP against the $1,960,000 credit (the "Refund") referenced in the November 11, 2003 letter and threatened Policy cancellation. Subsequently, the Carrier refused to complete the premium endorsement and process the Refund. Following discussions between counsel for the parties, the Carrier agreed to forbear from terminating the Current Policy.

27. Thereafter, on November 19, 2003, Debtor filed the above-captioned adversary proceeding and Motion for Temporary Restraining Order and/or an Order Pursuant to Section 362 of the Bankruptcy Code Enforcing the Automatic Stay and Seeking Sanctions. Following a hearing on the matter, and pursuant to an agreement of the parties memorialized by Order entered December 2, 2003, the Court granted an injunction against the Carrier enjoining the Carrier from canceling the policy without first obtaining relief from the automatic stay, from setting off any amounts owing in connection with Debtor, Cananwill, or the policy without further order, and providing that such injunctions shall extend until further order after judgment or settlement of the above-captioned adversary proceeding.

28. On December 5, 2003, Debtor and Cananwill filed an amended complaint in the Adversary Proceeding (the "Amended Complaint"). Pursuant to the Amended

Complaint, Cananwill, previously a named Defendant, joined Debtor as a Plaintiff in the Adversary Proceeding.

29. The Adversary Proceeding primarily seeks a refund based upon the amount set forth in the November 11, 2003 letter. It is undisputed that these calculations were based upon payroll numbers and classifications provided to the Carrier from Debtor and AON rather than by conducting a payroll audit of the actual payrolls and employee classifications. Consequently, the Carrier contends that the figures with respect to the Refund may not be accurate, but contends that the LSRP figures provided are likely correct as they proffer that Debtor reached a maximum amount Debtor could possibly owe under the LSRP for the Prior Policy. There appears to be no dispute, to the extent an LSRP is owed, that the maximum amount an insured would be obligated to pay under the LSRP is capped at an additional 75% of the actual policy premium.

30. Both the Prior Policy and the Current Policy contained LSRP endorsements and a blank schedule of factors with a "0.00" figure provided next to the "Subsequent Adjustments" line on the schedule. The Carrier contends that the S.C. Plan provides the figures needed not only for the Policies it has with Debtor but for all assigned risk policies, and that the S.C. Plan was provided to it by SCDOI and is the document the Carrier relies upon in issuing its policies.

31. Inasmuch as the November 11, 2003 letter provided estimates of the alleged LSRP amount owed under the Prior Policy as well as a potential Refund, in order to more accurately determine the precise amount of refund arising from Debtor's reduction of workforce, the Carrier has subsequently conducted and completed an audit of Debtor's current payroll and submitted the results of that audit to the Court for its consideration in this matter. Accordingly, the Court has been advised that the parties have stipulated that the amount of basic premium for the Current Policy is $793,369, that the amount of any Refund owed, if any, is $1,289,691, and that the maximum amount of LSRP Debtor owes, if any, under the Current Policy is $594,854. Accordingly, with these figures having been provided, the Court can make a determination on the issues.

## CONCLUSIONS OF LAW

■ At issue in this case are amounts allegedly due by both parties under the Policies. Debtor is seeking a return of premiums (as previously defined, the "Refund") paid at the beginning of the Current Policy term due to its reduction in workforce related to its bankruptcy filing. The Carrier refuses to provide a Refund because it contends it is entitled to setoff or recoup the Refund against amounts it alleges are due from Debtor. Debtor disputes that any amount is due pursuant to the Prior Policy, except with respect to the $195,000 Audit Claim that the parties stipulated is a prepetition claim. As a secondary issue, the Carrier further contends that even if it is not entitled to setoff or recoup amounts due under the Prior Policy, it should not be forced to turnover the Refund inasmuch as there are amounts owed under the Policies that cannot be finally calculated until the end of the Policy term. Finally, Debtor asserts that the Carrier violated the automatic stay by issuing a letter to Debtor indicating its intent to cancel the Current Policy unless certain amounts due under the Prior Policy were paid and refusing to pay the Refund. In order to determine Debtor's present entitlement to the Refund, if any, the Court must first determine whether there are any amounts due to the Carrier under the Policies. The disputed amount

arises out of the Carrier's claim for an LSRP calculation that takes place following the end of the Policy terms.

## I. *APPLICABILITY OF LSRP*

Debtor asserts that the plain language of the Policies provides that the LSRP is inapplicable.[6] Further, Debtor contends that even if the LSRP application is unclear, any ambiguity in the Policies must be interpreted in favor of Debtor and against the Carrier. The Carrier argues that when read as a whole, the Policies are not ambiguous as to application of the LSRP premium.

 General rules of contract instruction pursuant to South Carolina law apply. The intent of the parties is to be primarily considered, which can be ascertained from the language of the Policies. *Schulmeyer v. State Farm Fire and Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003); *Goldston v. State Farm Mut. Auto. Ins. Co.*, 358 S.C. 157, 169–70, 594 S.E.2d 511, 518 (Ct.App.2004). If the language is clear and unambiguous, the language alone is controlling. *Schulmeyer*, 353 S.C. at 495, 579 S.E.2d at 134. If capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted. *Hansen v. USAA*, 350 S.C. 62, 68, 565 S.E.2d 114, 117 (Ct.App.2002) (citation omitted).

 A contract is considered "ambiguous" only when it may fairly and reasonably be understood in more ways than one:

A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Hansen,* 350 S.C. at 68, 565 S.E.2d at 116–17 (quoting *Hawkins v. Greenwood Dev. Corp.*, 328 S.C. 585, 592, 493 S.E.2d 875, 878 (Ct.App.1997)). In construing an insurance contract, all of its provisions should be considered, and one may not, by pointing out a single sentence or clause, create an ambiguity. *Schulmeyer v. State Farm Fire and Cas. Co.*, 353 S.C. at 495, 579 S.E.2d at 134.

 Once a determination is made that the contract is unambiguous, the Court must enforce it according to its terms "regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." *Ellis v. Taylor*, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994) (citation omitted). The Court is to consider a construction that permits a sensible and reasonable interpretation rather than one that will lead to absurd consequences or unjust results. *Bruce v. Blalock*, 241 S.C. 155, 127 S.E.2d 439 (1962). Further, "where one construction makes the provision unusual or extraordinary and another construction which is equally consistent with the language employed would make it reasonable, fair and just, the latter construction must prevail." *C.A.N. Enterprises, Inc. v. S.C. Health and Human Services Finance Comm'n*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988).

When read as a whole, the Policies could not reasonably be understood in more ways than one. The Policies are replete with references to the applicability of an LSRP. The first two pages of the Policies

---

**6.** The Court refers to the Prior Policy and the Current Policy throughout this decision as the "Policies." It appears undisputed that the language of the Policies with respect to the LSRP is the same, as well as the parties' arguments concerning the LSRP application. Therefore, the Court will address both Policies in one discussion.

are entitled "Information Page" and reference "LSRP." The Information Page also notes that the total estimated cost is a "Deposit Premium." Additionally, certain terms appended to the Policies provide that the premium is an estimate, and the final premium will be determined by "using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy."

Perhaps the most telling portion of the Policies with respect to the application of an LSRP is the Endorsements included in the Policies. The Policies contain an Assigned Risk Loss Sensitive Rating Plan Notification Endorsement and an Assigned Risk Loss Sensitive Rating Plan Notification Endorsement (the "Endorsements"). The Endorsements provide as follows:

> This plan will adjust your premium for this insurance based upon the losses incurred during the period covered by this insurance.

The Endorsements further specifically state that:

> Your insurance is written under the South Carolina Workers Compensation Assigned Risk Plan that has adopted the Loss Sensitive Rating Plan (LSRP).

The Endorsements further set forth the LSRP Premium elements, the formula for calculation of the LSRP Premium, and when calculations and payments related to the LSRP Premium must be made.[7] Accordingly, the Policies, including the Endorsements, unambiguously provide that an LSRP applies in South Carolina and should have put Debtor on notice as to the further adjustment of premium.[8]

Debtor's primary support for its argument that the LSRP is inapplicable is a blank schedule attached to the Assigned Risk Mandatory Loss Sensitive Rating Plan Endorsement (the "Schedule"). The Schedule is to contain calculation factors, but those factors are not provided with the exception of a "0.00" next to the "Subsequent Adjustments" category.[9] Testimony on behalf of the Carrier elicited that their computer does not insert those factors for any of the thousands of policies it has in force, but that the standard factors are provided in the S.C. Plan drafted by the NCCI. Debtor relies on the "0.00" listed next to the "Subsequent Adjustments" cat-

---

7. The Application for both Policies provides that the coverage is under a Workers Compensation Insurance Plan, Assigned Risk Section. The Applications to the Policies further provide in a jurisdiction where the NCCI, Inc. Loss Sensitive Rating Plan has been approved for use, that the signatory acknowledges as follows:

> I acknowledge that the NCCI, Inc. Loss Sensitive Rating Plan has been explained to me or that an explanatory notice or brochure has been provided to me and I agree that I shall be bound by the terms of such plan if my estimated annual premium or preliminary physical Audit Claim meets or exceeds the premium eligibility requirements.

Both Applications were signed by an officer of the Debtor as well as a "producer"—in each instance, a representative of Debtor's broker from AON.

8. Debtor concedes that it paid an LSRP deposit of 20% of the estimated premium for both Policies. Testimony by the representative of AON was that he believed the 20% LSRP deposit on both Policies was a maximum "upcharge." As will be more fully addressed later, the representative of AON testified that he did not read the Policies prior to the Petition Date. Based upon the evidence presented, including his failure to read the Policies, his belief is not reasonable. Nevertheless, the Court is able to ascertain the applicability of the LSRP based on the clear contract language.

9. It appears that the "0.00" is set forth under a subpart of the Schedule entitled LSRP Development Factors: Subsequent Adjustments.

egory on the Schedule for the proposition that "0.00" applies to all factors. However, Debtor's alleged reliance on the "0.00" factor under the sub-part entitled "Subsequent Adjustments" is not proper for the reasons set forth below.

Based upon the language of the Policy, the Court finds no ambiguity in that, when read as a whole, a reasonable person could not construe the Policy in two different ways. The fact that the Schedule to the LSRP Endorsements is blank does not render the Endorsements and other references to the applicability of an LSRP null. *See Schulmeyer*, 353 S.C. at 495, 579 S.E.2d at 134 (party cannot point to single sentence or clause to create ambiguity; all provisions should be considered). The Carrier contends that the S.C. Plan provides the specific factors applicable to all policies written under the same plan. Debtor argues that the Policy does not expressly incorporate the S.C. Plan and that the Policies provide that the only agreements relating to the insurance are stated in the Policies.

As previously noted, the Endorsements specifically provide that the Policy is "written under the South Carolina Workers Compensation Assigned Risk Plan that has adopted the Loss Sensitive Rating Plan (LSRP)," and the S.C. Plan provides that:

> The rules under this Plan are *mandatory and apply only to Workers Compensation and Employers Liability Insurance that is written under the South Carolina Workers Compensation Assigned Risk Plan* .... The Loss Sensitive Rating Plan (LSRP) shall apply to all assigned risk employers qualifying for the Plan. The elements in the LSRP are fixed and premium is [sic] determined and defined below.

(Emphasis added). Accordingly, the Court finds it reasonable that an insured could examine the S.C. Plan to determine the specific factors applicable to all policies written under the assigned risk plan.[10] The S.C. Plan provides that the "LSRP Development Factors: Subsequent Adjustments" are not applicable in South Carolina.[11] The fact that the Schedule does not set forth the standard coefficients for *how* the LSRP is finally calculated after the end of the Policy term does not render the LSRP itself inapplicable, nor does it transform the Policy into being capable of two different reasonable interpretations. The LSRP Endorsements are provided in the Policies, and a reasonable person, in reading the entire policy in conjunction with the remainder of the Policy, would not read the Schedule to negate the numerous other notifications to the insured of the applicability of the LSRP.

■ Additionally, there is established precedent that a "person who signs a contract or other written document cannot avoid the effect of the document by claiming he did not read it." *Regions Bank v. Schmauch*, 354 S.C. 648, 663, 582 S.E.2d

---

10. Testimony on behalf of AON was that AON did attempt to obtain a copy of the S.C. Plan, but was referred by the Carrier to the applicable state agency that referred him back to the Carrier. AON's representative conceded that he did not pursue obtaining a copy of the S.C. Plan further.

11. It is noteworthy that the factors are not dollar figures particular to the Policy, but are coefficients that apparently remain constant for all policies written under the S.C. Plan.

Further, a calculation based on the factors could not be completed at Policy inception, because the variables associated would not be ascertainable until the losses from the Policy year are developed, and the Policy provides that such calculation commences 18 months following the Policy inception and continues thereafter at intervals of 30, 42, and 54 months, as specifically provided in the Assigned Risk Mandatory Loss Sensitive Rating Plan Endorsement.

432, 440 (Ct.App.2003) (guarantor bound by guaranty agreement even though concedes she did not read contract) (citing *Sims v. Tyler*, 276 S.C. 640, 643, 281 S.E.2d 229, 230 (1981); *Evans v. State Farm Mut. Auto. Ins. Co.*, 269 S.C. 584, 587, 239 S.E.2d 76, 77 (1977)). *See also Provident Life & Accident Ins. Co. v. Anderson*, 166 F.2d 492, 495 (4th Cir.1948) (noting that it is well settled under South Carolina law that insured has duty to read insurance policy; failure to do so estops party from avoiding contract); *Doub v. Weathersby–Breeland Ins. Agency*, 268 S.C. 319, 326, 233 S.E.2d 111, 114 (1977) (in tort action for misrepresentation regarding insurance policy, court noted that "[o]ne entering into a contract should read it and avail himself of every reasonable opportunity to understand its contents and meaning."). Testimony on behalf of Debtor and AON, its agent, was uncontroverted that neither read the Policies.[12]

Finally, Debtor contends that the LSRP is not applicable because the Carrier did not provide requisite notices mandated by the S.C. Plan.[13] The S.C. Plan provides that the LSRP Endorsements must be included as part of the Policy. The parties do not appear to dispute that the Endorsements, as previously set forth, are provided. The S.C. Plan also requires that the "Applicant's Statement," which is contained in both application forms as previously noted, be included (the "First Notice"). The second reference is a standard statement which the S.C. Plan says should

be contained in the Policy and which is to state that coverage is being bound pursuant to the Loss Sensitive Rating Plan ("LSRP") in the event the premium is above a described maximum (the "Second Notice"). The First Notice requirement was met when the plan administrator, NCCI, included the required language in the application form Debtor submitted to the Carrier.

As to the Second Notice to be contained in the Policy language, testimony on behalf of the Carrier was that the Carrier used the standard LSRP endorsements drafted and copyrighted by NCCI. Although the Policy does not recite the notice exactly as written in the S.C. Plan, the Policy specifically and unambiguously notifies the policyholder that the LSRP has been adopted in South Carolina and states that the plan will be adjusted based upon the losses incurred.

In conclusion, the Court finds that the intent of the parties can be ascertained from the language of the Policies viewed in its entire context. Based on such review, a reasonable person cognizant of the assigned risk insurance market, would not view the Policies as capable of two different interpretations. *See Hansen v. USAA*, 350 S.C. 62, 68, 565 S.E.2d 114, 117 (Ct. App.2002) (standard is that of a reasonably intelligent person that has considered the context of the entire integrated agreement and is cognizant of the industry standards

---

**12.** The Carrier addresses AON's duty, as Debtor's agent, to be familiar with and explain the applicability of the S.C. Plan to Debtor. The Carrier also points out that AON is not a named defendant in this lawsuit and elicited testimony that AON may be related to the Plaintiff, Cananwill, Inc., in some capacity. The Court need not address AON's duties nor directly allocate any responsibility to them inasmuch as they are not a party to this lawsuit and, most importantly, because the

Court need only examine the Policy to address the issues presented.

**13.** Debtor argues on the one hand that the S.C. Plan is not incorporated into the Policy, but on the other hand that the LSRP is not applicable based upon the Carrier's alleged failure to provide certain notices required by the S.C. Plan.

as generally understood). Accordingly, the LSRP is applicable to both Policies.[14]

## II. SETOFF AND RECOUPMENT

 The Carrier contends that the doctrine of recoupment should be utilized to reduce the amount of any Refund the Carrier owes Debtor due to the reduction in workforce, because Debtor concurrently owes the Carrier an LSRP premium and an additional Audit Claim arising out of the same transaction. Even if the Court determined that the Carrier was not entitled to utilize the doctrine of recoupment, the Carrier contends it should be allowed to setoff its debt to Debtor by the amount of its claim against Debtor.[15] This Court has previously addressed the doctrines of setoff and recoupment and analyzed their distinctions:

> "A 'set-off' is a demand which the defendant has against the plaintiff, arising out of a transaction extrinsic to the plaintiff's cause of action, whereas a 'recoupment' is a reduction or rebate by the defendant of part of the plaintiff's

claim because of a right in the defendant arising out of the same transaction." Black's Law Dictionary—5th Ed. citing *Zweck v. D P Way Corp.*, 70 Wis.2d 426, 234 N.W.2d 921, 924. Recoupment, which originated as an equitable rule of joinder, arises when a debtor and a creditor have claims against each other that arise out of the same transaction. *In re B & L Oil Co.*, 782 F.2d 155 (10th Cir.1986). It is distinguishable from set-off, which arises when the debtor's and creditor's claims against each other arise out of separate transactions. *See generally* 4 Collier on Bankruptcy § 553.03 (15th ed.1994).

*Aetna Life & Casualty Co. v. LaPierre (In re LaPierre)*, 180 B.R. 95, 99–100 (Bankr.D.S.C.1994). The Court will first address setoff of the Refund against amounts due under the Prior and Current Policies.

### A. SETOFF: PRIOR POLICY

 Section 553 states in relevant part that the Bankruptcy Code does not affect:

---

14. Testimony was also presented by Cananwill regarding their belief that the Current Policy did not have a retrospective element based upon informal questions it posed to the Carrier during a routine review of the Policy prior to its providing financing. As previously noted, the Court's ability to interpret the intention of the parties by reliance upon the contract language is the Court's primary focus. Once that determination is made, the Court need not rely upon such extrinsic evidence, but notes that even if an ambiguity was presented, the evidence presented by Cananwill, who is not a named party to the Policy, would not have been determinative. *See Worley v. Yarborough Ford, Inc.*, 317 S.C. 206, 209, 452 S.E.2d 622, 624 (S.C.Ct.App.1994) (if contract unambiguous, court's role is to determine intent of the parties from contract language).

15. The Carrier's arguments center upon recoupment and setoff of the Refund against amounts allegedly due it under the Prior Policy based upon the LSRP charge and the addi-

tional Audit Claim. The Carrier's affirmative defenses assert that the Carrier is entitled to exercise setoff or recoupment for anything it is determined to owe to Debtor against what Debtor *owed* to Defendant. However, the Carrier does reference amounts due from Debtor that cannot be finally calculated until a later date, and generally asserts it should be entitled to setoff or recoup against those amounts due as well. Additionally, Debtor specifically addresses setoff or recoupment with respect to potential amounts due. Both parties have informed the Court that they are seeking a determination with respect to *any* amounts due under either the Prior or Current Policies. Accordingly, the Court will address setoff and recoupment with respect to both Policies, but will do so by separate discussion for clarity. *See In re Camellia Food Stores, Inc.*, 287 B.R. 52, 66 (Bankr.E.D.Va. 2002) (court can adjudicate matters even if not originally/specifically pled where parties place issue before Court through their argument and subsequent pleadings).

[A]ny right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of this case, except to the extent that—(1) the claim of such creditor against the debtor is disallowed . . . .

11 U.S.C. § 553. Where its requirements are met, § 553 allows a bankruptcy court to recognize a creditor's pre-existing right of setoff in a bankruptcy case. Section 553 does not create any rights of setoff, but merely recognizes and preserves setoff rights that exist under other applicable law, and then only to the extent that the conditions of § 553 have been satisfied. *See, e.g., Durham v. SMI Indus. Corp.*, 882 F.2d 881, 883 (4th Cir.1989).

■ The parties do not dispute that a general right of setoff pursuant to common law exists under South Carolina law. However, the claims or debts to be setoff under South Carolina law must be mutual. *See S.C. Nat'l Bank v. Hammond*, 260 S.C. 622, 630, 198 S.E.2d 123, 127 (1973); *Elliott v. Carroll*, 172 S.C. 276, 173 S.E. 908, 911 (1934). Additionally, in order to assert a right of setoff under section 553, a creditor must establish each of the following by a preponderance of the evidence:

(1) The creditor must hold a "claim" against the debtor that arose before the commencement of the case;

(2) The creditor must owe a "debt" to the debtor that also arose before commencement of the case;

(3) The claim and the debt must be "mutual"; and

(4) The claim and the debt must each be valid and enforceable.

11 U.S.C. § 553; *In re Camellia Food Stores, Inc.*, 287 B.R. 52, 59 (Bankr. E.D.Va.2002) (creditor must meet burden by preponderance of the evidence). The Court need only consider the first three requirements as it has already determined that the claims and debt desired to be setoff are valid and enforceable obligations.[16]

### i. FIRST AND SECOND REQUIREMENTS FOR SETOFF: DETERMINATION OF WHEN CLAIM AND DEBT AROSE

■ The general rule is that a postpetition claim may be offset against a postpetition debt so long as both are valid, mutual obligations. *See* 4 COLLIER ON BANKRUPTCY, § 553.03[3][6] at 553–56 (15th ed. rev.2003). It is clear, however, that setoff of a prepetition claim against a postpetition debt is prohibited. 11 U.S.C. § 553(a); *see, e.g., Camellia*, 287 B.R. at 60 (postpetition premiums could not be offset against prepetition claims under prior policy years, including retroactive premium adjustments on prior year policies); *In re Express Parts Warehouse, Inc.*, 230 B.R. 526, 528 (Bankr.E.D.N.C.1999) (prepetition claim may not be offset against postpetition debt).

Accordingly, the Court must determine whether the LSRP due under the Prior Policy is a prepetition or postpetition obligation. Inasmuch as the parties have *stipulated* that the Refund is a postpetition obligation, if the Court determines that the LSRP is a prepetition obligation (the parties stipulated that the Audit Claim is a prepetition claim), setoff cannot be utilized

---

**16.** There appears to be no dispute that the Refund is a valid claim—it is the amount and timing of such that is at issue before the Court. Additionally, this Court has previously addressed the validity of the LSRP claim, and the parties have stipulated to the validity of the Audit Claim.

by the Carrier.[17] If the LSRP is determined to be a postpetition obligation, then the Court can consider the general rule that setoff of a postpetition claim is permitted against a postpetition debt, and the first and second requirements of § 553, as well as an element of mutuality, are met.[18] The Carrier argues, without citation to authority, that the LSRP claim is a postpetition claim because it was assessed postpetition. Debtor contends that the LSRP and Audit Claim are prepetition claims that relate to coverage under the Prior Policy, which ended well before the Petition Date.

█ Whether a claim arises before or after the commencement of a debtor's bankruptcy case is a question of federal bankruptcy law. *See, e.g., Butler v. NationsBank, N.A.*, 58 F.3d 1022, 1029 (4th Cir.1995); *Grady v. A.H. Robins Co., Inc. (In re A.H. Robins Co., Inc.)*, 839 F.2d 198, 203 (4th Cir.1988). The Fourth Circuit follows the "conduct test" articulated in *Grady* to examine whether a claim is prepetition or postpetition. *See Camellia*, 287 B.R. at 57 n. 2 (citing cases). The conduct test focuses on when a "right to payment" arises based upon the definition of a claim pursuant to 11 U.S.C. § 101(5). In *Grady*, a claimant sought recovery for injuries caused by debtor's Dalkon Shield product. Although the product was inserted prepetition, the injury did not manifest until postpetition. Therefore claimant argued her claim likewise arose postpetition. Since the definition under 11 U.S.C. § 101(5) is broad and includes claims that

are contingent, the Court of Appeals determined that the claimant's right to payment arose prepetition, and the right to payment was contingent upon the manifestation of an injury. *Grady*, 839 F.2d at 203.[19] The Fourth Circuit in *Grady* noted that "Congress intended that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in bankruptcy." *Id.* at 202.

Similarly, the Fourth Circuit affirmed a bankruptcy court decision applying the *Grady* conduct test based upon the broad definition of "claim." *Thompson v. Board of Trustees (In re Thompson)*, No. 95–3112, 1996 WL 431990 (4th Cir. Aug.2, 1996) (unpublished disposition affirming based upon "thorough opinions of the bankruptcy court" and district court). In *Thompson*, the claimant sought payment for retirement benefits and contended that his claim arose postpetition as he became eligible to receive the benefits after his case was commenced. The bankruptcy court determined, following *Grady*, that the claimant's right to payment for retirement benefits arose when he joined the police department and became a participant in the plan. 182 B.R. 140, 153 (Bankr.E.D.Va.1995) (noting that the *Grady* analysis applies to claims relating to contracts). The court further held that the "25–year requirement was merely a contingency [the claimant] had to meet in order to have an immediate right to payment." *See also Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 647

---

**17.** The amounts due under the Prior Policy are the Audit Claim and the LSRP.

**18.** The determination of whether the claims are both postpetition or prepetition in nature is also one element of the third requirement under § 553—mutuality.

**19.** Although the issue before the Fourth Circuit in *Grady* was when a claim arose for

purposes of the automatic stay, the Court defined a claim under 11 U.S.C. § 101(5) broadly, and courts have generally applied the conduct test to determine when a claim arises for purposes other than under 11 U.S.C. § 362. *See, e.g., Camellia*, 287 B.R. at 57; *Thompson v. Board of Trustees (In re Thompson)*, 182 B.R. 140, 153 (Bankr.E.D.Va.1995).

(D.Md.1998) (applying Grady and broad definition of claim to determine that a buyout claim arose prepetition although contingent and unliquidated). *But cf. River Place East Housing Corp. v. Rosenfeld (In re Rosenfeld)*, 23 F.3d 833 (4th Cir.1994) (distinguishing Grady and holding that obligation to pay assessments arose from continued postpetition ownership of property and not from prepetition contractual obligation; but suggesting right to payment would have arisen when a contract was made, with a continuing ownership contingency, to extent covenant to pay assessments had been considered a contract). Applicable Fourth Circuit authority broadly construes the definition of a claim. As such, it would appear that the LSRP claim under the Prior Policy arose upon Policy inception, and the injuries were a contingency that had to be met to trigger liability.

Nevertheless, there is case law that arguably supports an argument that the conduct giving rise to the LSRP charge is the actual occurrence of the injuries, thus an LSRP claim relating to those injuries arises at the time of the injury. *See Camellia*, 287 B.R. at 58 (insurance premiums were postpetition obligations where related coverage was postpetition; coverage is "conduct" giving rise to claim for premium payment); *West Virginia Hosp. Ins. Corp.*

*v. Broaddus Hosp. Ass'n (In re Broaddus Hosp. Ass'n)*, 159 B.R. 763 (Bankr. N.D.W.Va.1993) (claim for deductibles arose at time of injury). However, *Camellia* is not directly analogous to the matter before the Court with respect to the limited issue of payment of premiums. In *Camellia*, the court considered whether payments for insurance coverage on a monthly basis arose prepetition. The court determined that under the conduct test, the right to payment arose upon an offer of continued insurance coverage—if the insurer stopped covering worker's compensation claims, the debtor would no longer need to pay premiums. 287 B.R. at 57. The Court in *Broaddus* did not address the conduct test and narrowly interpreted the definition of claim pursuant to 11 U.S.C. § 101(5), which appears to be contrary to applicable authority.

Nevertheless, no matter how one interprets the conduct test, the timing of the right to payment of the LSRP charge under the *Prior* Policy is an easier question—both the Policy inception and the coverage under the Policy year occurred prepetition. Accordingly, the Carrier's claims under the Prior Policy, both the LSRP and the Audit Claim, are prepetition claims.

However, the parties stipulated that the Refund constitutes a post-petition debt.[20]

**20.** The Court notes that if it were to determine whether the Refund is a pre or postpetition claim it would apply the "conduct test" adopted by the Fourth Circuit. In so doing, the Court would consider whether the Refund is a prepetition obligation based upon a theory that the right to payment arose upon inception of the Current Policy, and the reduction in workforce was a "contingency" or "occurrence of extrinsic event" that triggered the Refund, based upon cases applying the conduct test as previously discussed. *See Grady*, 839 F.2d at 203; *In re Thompson*, 182 B.R. at 152–53. Additionally, the payment of the entire estimated premium by Cananwill upon Policy inception may be a consideration.

Some courts have held, including a prior decision of this Court, that "[u]nearned premiums come into existence immediately upon funding of a policy, not when the policy is canceled." *Felder v. American General Finance, Inc. (In re Felder)*, 2000 WL 33710885, C/A No. 97–05465–B, Adv. Pro. No. 98–80146, at *13 (Bankr.D.S.C. Jul. 7, 2000) (interest in unearned premium existed at time premium was paid to insured); *Borg–Warner Credit Corp. v. RBS Indus., Inc.*, 67 B.R. 946, 951 (Bankr.D.Conn.1986) (unearned premiums were property that existed as of effective date of policies). The Court need not determine this issue based upon the parties' stipulation.

Pursuant to § 553 and clear precedent that setoff of prepetition claims is not proper against postpetition debts, the Carrier fails to meet its burden of proving the first and second elements of setoff.

### ii. THIRD REQUIREMENT FOR SETOFF: CLAIMS AND DEBT DESIRED TO BE SETOFF ARE MUTUAL

■ The Carrier's claim for setoff additionally fails because the Refund and the claims under the Prior Policy involve different parties, rights, and capacity, thus defeating mutuality. Section 553, and South Carolina law, requires that the relevant claim and debt be "mutual" for setoff to be allowable. Courts have generally held that the requirement of mutuality should be strictly construed. *See, e.g., King v. Fulbright & Jaworski, LLP (In re Koch)*, 224 B.R. 572, 576 (Bankr.E.D.Va. 1998); *In re Virginia Block Co.*, 16 B.R. 560, 561 (Bankr.W.D.Va.1981). Although the Bankruptcy Code does not define "mutual," courts applying § 553 have held that mutuality means that the prepetition debt and claim must be owed between the "same parties," acting in the "same capacity," and that the obligations must be owed in the same "right," and have again reiterated the need for both obligations to be "prepetition" in nature. *See* 5 COLLIER ON BANKRUPTCY, ¶ 553.03[3][a], 553–27 (15th ed. rev.2003).

■ A primary requirement of mutuality is that the relevant claim and debt exist between the "same parties." *See, e.g., In re Ingersoll*, 90 B.R. 168, 171 (Bankr. W.D.N.C.1987). The attempted setoff by the Carrier does not involve the "same parties" acting in the "same capacity" or "rights" with respect to the claims and debt at issue. *See In re Welco Constr. & Util. Co.*, C/A No. 89–01725, slip op. at 5 (Bankr.D.S.C.1995) (debtor not permitted to setoff claim for fire loss against claim for earned premium by premium financer; premium financer was not acting on behalf of insurance company when it loaned debtor a portion of premium, thus mutuality is not present). While the Carrier's claims are against Debtor, the Refund may be owed to Cananwill.[21] Because the obligations here involve different parties, rights, and capacity, setoff is not available. The Court holds based on the above that the Carrier has not met its burden of satisfying § 553's express requirements.

### B. SETOFF: CURRENT POLICY

The Carrier faces the same issues with respect to setting off the Refund against amounts owed under the Current Policy. The Refund has been stipulated to be a postpetition claim, and the outstanding amount due under the Current Policy is an LSRP amount that has been calculated at

21. Debtor and Cananwill agreed that the entire Refund should be paid to Cananwill as an initial matter. Their agreement does not resolve any legal determination necessary as to whether the amount is actually owed to Cananwill or Debtor.. The Court is cognizant of S.C.Code Ann. § 38–39–10 which provides that "whenever an insurance contract is cancelled, the insurer shall return whatever gross unearned premiums are due under the insurance contract to the premium service company which financed the premium for the account of the insured." Inasmuch as the Current Policy has not been cancelled, the cited statute is inapplicable based upon its plain language. *See* S.C.Code Ann. § 38–39–90 (Law. Co-op.2002 rev.). The Court need not determine the issue inasmuch as setoff fails under the first and second requirements of § 553. However, the Court notes authority that the assignment of rights to a premium financer of unearned premiums may render any unearned premium outside of the property of the estate. *Felder v. American General Finance, Inc. (In re Felder)*, 2000 WL 33710885, C/A No. 97–05465–B, Adv. Pro. No. 98–80146, at *13–14.

an estimated "maximum" amount due.[22] For the reasons previously set forth with respect to the conduct test, particularly applying that analysis set forth in *Grady* and *Thompson*, the LSRP under the Current Policy is arguably considered a prepetition claim that arose upon Policy inception, the contingency being the occurrence of the requisite injuries. Interestingly, Debtor does not raise the argument that the LSRP charge occurred upon Policy inception, but instead seems to relate the court's analysis in *Camellia* regarding payment of monthly coverage premiums to the LSRP charge in this case and concedes that the LSRP charge should be allocated based upon when the injuries occur.

The Court has not been presented with any argument that there were injuries postpetition nor requested to consider such allocation. The Court accepts Debtor's acknowledgment at this point in time that the LSRP is for all intents and purposes a prepetition claim under the Current Policy as apportioned to those injuries that occurred prepetition. Accordingly, for the reasons previously set forth, and setoff of a prepetition debt (LSRP) against a postpetition claim (the Refund) is not permissible.

Additionally, applicable mutuality concerns remain to the extent previously addressed. In sum, setoff of the postpetition Refund against the prepetition Audit Claim and the prepetition LSRP due under the Prior and Current Policy is unavailable.

## C. *RECOUPMENT: PRIOR POLICY*

The determination of whether obligations arise out of the "same transaction" is typically the key question in cases addressing recoupment. This is a case-by-case determination, and the courts have developed two tests for whether the "same transaction" requirement is met. The more liberal "logical relationship" test developed by the Ninth Circuit allows for a loose meaning of "transaction," which may include a series of many occurrences depending not on their immediate connection so much as their logical relationship to each other. *See, e.g., Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1402–03 (9th Cir.1996) (allowing recoupment between an obligation arising out of an indemnity agreement and a separate rental obligation involving the same parties).

The more conservative "integrated transaction" test developed by the Third Circuit requires that the obligations at issue "arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations." *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1081 (3d Cir.1992); *In re Camellia*, 287 B.R. at 61.

Although the Fourth Circuit has not explicitly adopted either test for evaluating the "same transaction" requirement, the Fourth Circuit affirmed a Virginia bankruptcy case that cited *University Medical Center* and applied the "integrated transaction" test. *See Thompson*, 182 B.R. at 148. *See also Camellia*, 287 B.R. at 61 ("the Fourth Circuit Court of Appeals has implicitly endorsed the integrated transaction test."). Moreover, the Fourth Circuit has often referred to recoupment as applicable to "claims arising out of the same contract." *Camellia*, 287 B.R. at 61 (citing Fourth Circuit cases).

---

**22.** The parties presented, pursuant to the post-trial audit previously referenced, the maximum LSRP due under the Current Policy.

▮▮▮▮ Therefore, the Fourth Circuit and cases within the Circuit are closely aligned with the "integrated transaction" test, and it appears that a determination of whether the Prior Policy and Current Policy are considered separate contracts is a key factor in considering the availability of recoupment. Accordingly, the Court will consider whether the Prior Policy and the Current Policy are one contract and, if one contract exists, whether the Refund due on the Current Policy and the amounts due under the Prior Policy arise out of the same transaction.[23]

▮▮▮ South Carolina law holds that a renewal of an insurance contract is a new contract, unless the policy requires both parties to renew and no terms of the policy (including the premium) are changed from year to year. *Webb v. South Carolina Ins. Co.*, 305 S.C. 211, 213, 407 S.E.2d 635, 636 (S.C.1991) ("Unless (1) the expiring policy mandates the same terms shall remain in effect and (2) the terms or the policy do not change upon renewal," renewal of an insurance contract is a new contract). Where renewal specifically contemplates a new premium, the South Carolina Supreme Court holds that renewal of an insurance policy constitutes a new contract. *Id. See also Knight v. State Farm Mutual Auto. Ins. Co.*, 297 S.C. 20, 22, 374 S.E.2d 520, 522 (Ct.App.1988) ("The general rule is that the renewal of a policy of insurance for a fixed term is in effect a new contract and must contain all the essentials of a valid contract.") (citing cases).

In the matter before the Court, the Policies specifically contemplate negotiation of new terms, including a new premium amount, every year. It is undisputed that the Prior Policy and Current Policy had different premium amounts and different policy numbers. The Policies also had different experience modification and other rating terms.

Although the Carrier testified that it believed it had to renew coverage after expiration of the Prior Policy term, the weight of the evidence belies this assertion. The Carrier has pointed to no statute or term of the Policies requiring continuation of the Prior Policy by both parties. In fact, the parties submitted by stipulation a Policy Termination/Cancellation/Nonrenewal Notice (the "Notice") dated April 28, 2003, stating that the Prior Policy coverage would be nonrenewed due to the expiration of the Policy as of June 1, 2003.[24] The Notice further provided "in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that the above mentioned policy will expire effective [6/01/03]." The Court was also provided a series of e-mails drafted near the time of renewal, containing exchanges of information between NCCI and the Carrier, indicating that the Carrier "offered renewal." In addition, there is no requirement in the draft S.C. Plan requiring the Carrier and/or the Debtor to continue coverage after the Prior Policy term. The language of the

---

**23.** Even if obligations arise under the same contract, this does not necessarily mean they arise out of the "same transaction." *Thompson*, 182 B.R. at 148 ("One contract alone, however, is not sufficient to establish a single transaction, since separate transactions may occur within the confines of the contract.") (citing *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065 (3d Cir.1992)); *In re Peterson Distrib., Inc.*, 82 F.3d 956, 960–61 (10th Cir.1996) (recoupment not permitted with respect to various transaction among the parties pursuant to one franchise agreement).

**24.** This appears to be a standard notice issued by the Carrier as the expiration of a policy draws near and weakens the Carrier's argument that they must renew policies such as Debtor's as a matter of course.

S.C. Plan contains the following language:

**Renewal and Nonrenewal**

If the carrier is willing to renew the employer, a renewal notice shall be sent that meets the requirements of the appropriate South Carolina state law. . . . If a contract carrier is unwilling to renew a policy, a nonrenewal notice must be sent that meets the most restrictive requirements of the appropriate state law and/or the provisions of the SCWCARP.

This language indicates that an insurer may elect whether or not to offer coverage when an existing assigned risk policy is about to expire.

Moreover, the Policies themselves indicate that a new contract is intended to arise annually between the parties. The terms appended to the Policies provide that "[i]f the policy is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary date that this policy is in force." The Policies clearly provide for a term of one year in that the Policy Period is specifically referenced as from 6/01/2002 to 6/01/2003 for the Prior Policy and 6/01/2003 to 6/01/2004 for the Current Policy.

The Carrier argues that the Court should create an exception to the general South Carolina rule that renewals constitute new contracts of insurance, based on the fact that the Policies are assigned risk policies and cross-default each other if any payment obligations are outstanding by the insured. The Carrier cites no authority for this proposition. Even though the Current Policy may cross-default based on payment obligations under the Prior Policy, this does not overcome the plain language of the Policies indicating that they are intended to constitute new contracts

annually, not to be one continuous contract. Further, the Carrier's argument that the "assigned risk" nature of the Policies renders them unique, without citation to authority, does not persuade the Court to deviate from South Carolina law and the plain language of the Policies.

Finally, the *Camellia* bankruptcy case and its analysis on the issue of recoupment are instructive. *Camellia*, 287 B.R. at 60–62. At issue in *Camellia* were workers' compensation insurance policies spanning several years prior to the debtor's filing. The policies contained a retrospective element wherein the premiums are adjusted six months after the completion of the contract year, and annually thereafter. The carrier sought to recoup a return premium due debtor for the year of the bankruptcy filing against prepetition claims of the carrier for additional premiums owed under the prior policies pursuant to the retrospective adjustment. The court in *Camellia* found that the workers' compensation policies issued from 1995—2001 were distinct contracts and that recoupment was not available. The court also noted that the integrated transaction test is more closely in line with decisions rendered by the Fourth Circuit and noted that recoupment is continually defined as arising out of the same contract. The court cited Virginia law, similar to South Carolina law and the terms of the Policies, indicating that renewal of an insurance contract is a new contract, as well as the language of the policy providing that each policy term is for one year and stating that "if the policy period is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force." *Camellia*, 287 B.R. at 60–61.

The analysis in *Camellia* with respect to whether consecutive workers' compensa-

tion policies are considered part of the same transaction is consistent with applicable South Carolina authority. Based upon South Carolina law and the language of the Policies, the Prior Policy and the Current Policy, under which the Refund is owed, should be considered separate contracts, and recoupment is thus unavailable.[25] The Refund and the amounts due under the Prior Policy constitute separate transactions because they are not based upon the same contract, and are distinct transactions relating to separate claims. Accordingly, recoupment is unavailable to Carrier with respect to amounts due under the Prior Policy.

### D. RECOUPMENT:CURRENT POLICY

■ A separate issue is whether the Carrier is entitled to recoup amounts due by Debtor under the Current Policy against the Refund. Having determined that the Prior Policy and the Current Policy constitute two separate policy terms, the issue for the Court to determine, as previously discussed, is whether the Refund and the amounts due under the Current Policy arise out of the same transaction.[26] See Taylor v. Magnolia Manor–Rock Hill, Inc. (In re Taylor), No. 3:97–1471–23, slip op. at 12 (D.S.C. Mar. 6, 1998). In Taylor, defendants sought recoupment of rent entitlement under certain nursing home leases against overpayments of funds concerning a covenant not to compete that was determined not to exist. The District Court found that all payments were part of the same transac-

tion or series of transactions relating to the transfer of nursing homes and permitted recoupment.

Similarly, the evidence presented to the Court exhibits that the LSRP due for the Current Policy and the Refund arise out of the same transaction. Not only do the amounts at issue arise out of the same contract, but the Policy also provides that the premium is an estimated number that is modified by both an audit and a retrospective LSRP adjustment. Consequently, the premium is a fluid number that is to be adjusted and not finally determined until some period of time after the expiration of the policy term, thus consistent with the "same transaction" analysis. Cf. Aetna Life & Cas. Co. v. LaPierre (In re LaPierre), 180 B.R. 95 (Bankr.D.S.C.1994) (disability payments owed to insured and overpayments on single contract of long term disability insurance are reciprocal obligations arising out of same transaction).

■ Debtor argues that the Carrier cannot setoff or recoup prospectively for amounts which may come due in the future. Debtor cites two cases in support of its proposition, neither of which directly address recoupment. In re Buckley & Assocs. Ins., Inc., 78 B.R. 155 (E.D.Tenn. 1987) (setoff); In re Princess Baking Corp., 5 B.R. 587 (Bankr.S.D.Cal.1980) (setoff). The doctrine of recoupment contemplates reduction of a claim due to a claim by the countervailing party. Thompson, 182 B.R. at 146 ("[r]ecoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has

**25.** The Carrier argues that the Court should balance the equities and not permit Debtor to avoid recoupment due to Debtor's "inequitable conduct" concerning an alleged misrepresentation on Debtor's application that it had received no offers of voluntary coverage. Apparently, entry into the assigned risk market is precluded unless the prospective insured

cannot obtain coverage in the voluntary market. Nevertheless, the Court finds no evidence of bad faith in the representation made.

**26.** The amounts due already meet the threshold "same transaction" determination—they arise with respect to the same contract.

against the plaintiff arising out of the very contract giving rise to the plaintiff's claim.") (quoting *First Nat'l Bank v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n. 1 (4th Cir.1982)). The definition of "claim" in the Bankruptcy Code is very broad, and includes a right to payment, whether or not such right is, *inter alia*, unliquidated, contingent, or unsecured. 11 U.S.C. § 101(5). *See In re Eyke*, 246 B.R. 550, 558 (Bankr.W.D.Mich.2000) (recoupment permitted against future attorneys' fees to be incurred). Additionally, recoupment is an equitable doctrine, and courts have considered the standard for recoupment as requiring "that there be such a close, necessary relationship between the events that gave rise to the debtor's postpetition claim and the events that gave rise to the creditor's prepetition claim that the amount of the former cannot fairly be determined without accounting for the latter." *In re St. Francis Physician Network, Inc.*, 213 B.R. 710, 719 (Bankr. N.D.Ill.1997). Courts have also noted that "recoupment is justified in single contract bankruptcy cases, since there is but one recovery due on contract and that recovery must be determined by taking into account mutual benefits and obligations of the contract." *In re Heffernan Mem'l Hosp. Dist.*, 192 B.R. 228, 231 (Bankr.S.D.Cal. 1996) (citing cases).

Consequently, the amounts due under the Current Policy and the Refund are part of the same contract, arise out of the same transaction, and the application of recoupment in this case is consistent with the intent and purpose of the doctrine. The Carrier is entitled to recoup the amounts due under the Current Policy against the Refund.

## III. *VIOLATION OF AUTOMATIC STAY*

▮ Debtor asserts that the Carrier willfully and maliciously violated the automatic stay. Debtor bears the burden of proof on this issue and must prove the stay violation by clear and convincing evidence. *See Bolen v. Mercedes Benz, Inc. (In re Bolen)*, 295 B.R. 803, 807 (Bankr.D.S.C. 2002); *Brockington v. Citizens & S. Nat'l Bank of South Carolina (In re Brockington)*, 129 B.R. 68, 70 (Bankr.D.S.C.1991). Pursuant to 11 U.S.C. § 362(h), a debtor will not receive damages for a violation of the automatic stay unless such violation was "willful", and if damages are warranted, the court will award punitive damages only in "appropriate circumstances." 11 U.S.C. § 362(h).

The Fourth Circuit defines a willful violation of the automatic stay as occurring when a creditor knows of the pending bankruptcy petition and intentionally attempts to continue collection procedures in spite of it. *See Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 293 (4th Cir.1986) (affirming the lower court's ruling that a willful violation had occurred where the creditor was served with written notice of the bankruptcy filing yet the creditor repossessed one vehicle postpetition and attempted to repossess two others postpetition); *Bolen v. Mercedes Benz*, 295 B.R. at 807 (finding a willful violation of the stay where the creditor's repossession agents at the time of repossession were provided proof of the bankruptcy filing but repossessed vehicle and continued to retain vehicle).

▮ The Carrier's computer automatically sent a notice of cancellation dated October 27, 2003, which stated that the Carrier intended to cancel Debtor's Current Policy if the Debtor did not pay the prepetition Audit Claim of $195,031 by December 2, 2003. Debtor had previously issued the Carrier a check for this amount that was not honored. Additionally, based upon communications between the parties and a request by Debtor for calculations with respect to the Refund, the Carrier

responded to Debtor with a letter than referenced a reduction of the Refund by the amount of the prepetition Audit Claim and the LSRP. Clear and convincing evidence was not presented that the automatic cancellation notice, nor the letter in response to Debtor's request, was willful. *See Bolen*, 295 B.R. at 810 ("moving party bears the burden of proof in an action for violation of the automatic stay and must prove the violation by clear and convincing evidence").[27] Debtor did not meet its burden of proving a willful violation of stay, thus damages will not be awarded.

## IV. CONCLUSION

Having determined that the LSRP is applicable to the Policies, and given that the parties have now had an opportunity to conduct an audit and determine the amount of the Refund due to Debtor's reduction in workforce, turnover is appropriate.[28] Setoff and recoupment of the Refund are not available to the Carrier with respect to any amounts due under the Prior Policy (the Audit Claim and LSRP determination). Setoff of the Refund is likewise inapplicable with respect to amounts due under the Current Policy. However, for the reasons set forth herein, the Carrier is entitled to recoup the amounts due under the Current Policy against the Refund. As previously noted, the parties have agreed based upon a post-trial audit that the amount of basic premium for the Current Policy is $793,369, that the amount of any Refund owed, if any, is $1,289,691, taking into account the maximum LSRP Debtor owes under the Current Policy in the amount of $594,854. The Complaint also seeks to enjoin Carrier from canceling the Current Policy. Subsequent to trial in this matter, the Carrier

has filed a motion for relief from the automatic stay under § 362 and/or a motion to compel assumption or rejection of the Current Policy. The parties have agreed that the Carrier's requests for relief shall be considered at a later hearing following entry of this Order and thus termination of the Current Policy is enjoined until further Order of this Court. Accordingly, it is hereby

ORDERED that, taking into consideration a holdback of the maximum amount Debtor owes with respect to the LSRP under the Current Policy of $594,894, the Refund in the amount of $1,289,691 shall be tendered to Cananwill (based upon an agreement between Debtor and Cananwill) within ten (10) days of the date of this Order; and it is further

ORDERED that the Carrier may retain the maximum LSRP amount due under the Current Policy in the amount of $594,854 subject to further calculation, according to the terms of the Policies, or Order of this Court; and it is further

ORDERED that the Carrier is enjoined from canceling the Current Policy until further Order of this Court; and it is further

ORDERED that the Court will not award any damages based upon Debtor's allegations of a violation of the automatic stay by Carrier; and it is further

ORDERED that the relief sought in the Complaint having been addressed herein, the adversary proceeding can be closed.

**AND IT IS SO ORDERED.**

---

27. The Carrier also notes that Cananwill sent a similar notice of cancellation of its agreement to Debtor for which Debtor is not alleging was a violation of stay.

28. As previously noted, Debtor and Cananwill agreed the Refund should be submitted to Cananwill.